**Steven HAWORTH, Appellant
(Defendant),**

v.

**STATE of Wyoming, Appellee (Plaintiff).**

**No. 90–276.**

Supreme Court of Wyoming.

Oct. 22, 1992.

Dissenting Opinion of Justice Urbigkit
Nov. 19, 1992.

Rehearing Denied Dec. 8, 1992.

Leonard Munker, State Public Defender, Cheyenne, Wyoming, Defender Aid Program, Gerald M. Gallivan, Director, Timothy F. Marion, Student Intern, Laramie, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia L. Hackl, Deputy Atty. Gen., Mary B. Guthrie and Jennifer L. Gimbel, Sr. Asst. Attys. Gen., Cheyenne, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT,* and GOLDEN, JJ.

GOLDEN, Justice.

A jury found appellant Steven Haworth guilty of aggravated assault and battery [1]

---

* Chief Justice at time of oral argument.

1. Wyo.Stat. § 6–2–502 (1988):

(a) A person is guilty of aggravated assault and battery if he:

for his use of a pocketknife during a fight with Rod Risk on May 23, 1990, outside a bar near Casper, Wyoming. Haworth had claimed he used the knife in self-defense.

On appeal, Haworth raises one issue: Whether the prosecution's deliberate and covert intrusion into appellant's trial preparations, alerting the prosecution of appellant's defense strategy, violated appellant's fifth and sixth amendment rights to a fair trial and effective assistance of counsel, respectively.

We affirm.

## FACTS

The fight in which Haworth used the knife occurred on May 23, 1990. A few days later, law enforcement authorities arrested and charged Haworth. Unable to make bail, he remained incarcerated in the county jail through July 23, 1990, when his trial began.

For the weekend period immediately preceding the first day of trial on Monday, Haworth's defense counsel made arrangements with the county sheriff's office that enabled defense counsel to spend several hours each weekend day with Haworth in the same courtroom in which the trial was to be held. Haworth and his defense counsel used these weekend sessions to prepare for trial.

Since Haworth was unable to make bail and was in the sheriff's custody, the sheriff required that one of his deputies remain with Haworth during these trial preparation sessions. According to Haworth's defense counsel, and this fact is not challenged by the state, defense counsel paid the deputy sheriff's overtime wage necessitated by this custodial security arrangement. According to defense counsel, he

expressly told the deputy sheriff who remained with Haworth during these trial preparation sessions that the deputy sheriff was working for defense counsel and "none of this goes out of this room." [2]

During the first day of trial, when the prosecutor was on the last part of his direct examination of the state's first witness, Rod Risk, the victim, it became apparent to Haworth's defense counsel that the prosecutor had learned not only about Haworth's weekend trial preparation sessions with defense counsel but also about the substance of some of the conversations between Haworth and defense counsel during those sessions. During the examination of Rod Risk, the prosecutor, contendably setting the stage for his later cross-examination of Haworth and his still later closing argument to the jury, pointedly asked Risk whether he had practiced his testimony in the courtroom before testifying that day. The victim-witness answered he had not.

As a result of that questioning, at the start of the second day of trial the defense counsel and the prosecutor met with the trial judge in chambers to discuss defense counsel's concern that the prosecutor intended to cross-examine Haworth about the weekend trial preparation sessions. During this discussion, the trial judge learned about defense counsel's weekend trial preparation sessions with Haworth and the prosecutor's discovery of them. It was clear that the prosecutor had learned about the sessions, including the substance of some of the conversations between defense counsel and Haworth, from the deputy sheriff who had provided custodial security of Haworth during those sessions.

As a result of the in-chambers discussion, the trial judge ruled that the prosecu-

(i) Causes serious bodily injury to another intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;
(ii) Attempts to cause, or intentionally or knowingly causes bodily injury to another with a deadly weapon;
(iii) Threatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another; or

(iv) Intentionally, knowingly or recklessly causes bodily injury to a woman whom he knows is pregnant.
(b) Aggravated assault and battery is a felony punishable by imprisonment for not more than ten (10) years.

2. The prosecutor challenged the defense counsel's version of what he told the deputy but failed to present the deputy sheriff to testify about the matter, *infra*, p. 3.

tor could not talk about the defense's "rehearsals in this courtroom." The trial then resumed. The issue in question did not surface again until the third day of trial.

On the third day of trial, after the state had rested and all defense witnesses had testified except Haworth, defense counsel and the prosecutor again met with the trial judge in chambers. They again discussed defense counsel's concern that his work product had been compromised by the deputy sheriff's having divulged to the prosecutor the substance of some of the conversations between defense counsel and Haworth he had overheard during the weekend trial preparation sessions. Specifically, it was evident the prosecutor had learned from the deputy sheriff that defense counsel and the accused had discussed that the accused should, in his trial testimony, describe his use of the knife in the fight with the word "cut" instead of the word "stab." The prosecutor's main concern was that Haworth had been impermissibly coached; he wanted to expose this on cross-examination.[3]

During this in-chambers discussion, the prosecutor disputed the defense counsel's

representation to the trial judge that he had expressly instructed the deputy sheriff at the weekend sessions that confidentiality attached to all that was said during the sessions. The prosecutor, however, failed to present the deputy sheriff, place him under oath, and offer his testimony about what defense counsel had told him.

As a result of this in-chambers discussion, the trial judge ruled that the conversations between the defense counsel and Haworth during the weekend sessions were work product. The trial judge instructed the prosecutor, "You can't inquire into that area as being quoted from a lawyer to a client." After further discussion, the trial court said:

I think there are ways that the State is protected in their cross examination to get at what you are getting at. I think in view of the fact that the information of someone telling him, you know, the play on words, whether it is stabbed or cut, resulted from a conveyance of information by the deputy that had to be there. In other words, the defendant has to prepare his case and I suppose that had you called me, I would have said,

---

**3.** The subject of "coaching" was discussed in a United States Supreme Court case where the court held that the trial court's order preventing the accused from consulting with his counsel about any subject during a 17–hour overnight recess between the accused's direct-and-cross-examination violated the accused's sixth amendment right to counsel. In relevant part, Chief Justice Burger writing for the Court said:

The opposing counsel in the adversary system is not without weapons to cope with "coached" witnesses. A prosecutor may cross-examine a defendant as to the extent of any "coaching" during a recess, subject, of course, to the control of the court. Skillful cross-examination could develop a record which the prosecutor in closing argument might well exploit by raising questions as to the defendant's credibility, if it developed that defense counsel had in fact coached the witness as to how to respond on the remaining direct examination and on cross-examination.

*Geders v. United States,* 425 U.S. 80, 89–90, 96 S.Ct. 1330, 1336, 47 L.Ed.2d 592, 600 (1976).

For a useful and comprehensive analysis of the witness preparation problem, *see* John S. Applegate, *Witness Preparation,* 68 Texas L.Rev. 277 (1989). Although Professor Applegate examines the many aspects of the problem in the

civil litigation context, his article is illuminating to the criminal law practitioner as well. With respect to the specific issue in the case at bar, a lawyer's suggesting actual language to be used by a witness, Professor Applegate, relying on District of Columbia Bar, Legal Ethics Comm., Op. No. 79 (1979) (hereinafter Op. No. 79), notes that that practice "may be appropriate, as long as the ultimate testimony remains truthful and is not misleading." Applegate, *supra* note 5 at 279, and accompanying text.

Op. No. 79 specifically concerned a witness' *written testimony submitted in an adjudicatory hearing before a federal regulatory agency.* Nevertheless, the opinion states

that the particular words in which testimony, whether written or oral, is cast originated with a lawyer rather than the witness whose testimony it is has no significance so long as the substance of that testimony is not, so far as the lawyer knows or ought to know, false or misleading * * *. [T]hat a lawyer suggests particular language to a witness means only that the lawyer may be affecting the testimony as respects its clarity and accuracy; and not necessarily that the effect is to debase rather than improve the testimony in these respects.

Op. No. 79 at 139 (provided by the Texas Law Review, Austin, Texas).

shackle him and have the deputy step outside. But nobody called me. * * * And what we are after here is a fair trial * * *.

That just strikes me as being unfair. Not only that, but it strikes me as being a potential reversible error.

I think you can get at it in cross-examination without referring to the conversations between counsel and the Defendant. That would be my ruling.

The prosecutor then proposed that he would ask Haworth this question on cross-examination: "You have been specifically instructed to use the word 'cut' versus 'stabbed'"? The trial judge declared that that question was objectionable. On that point, the in-chambers discussion ended and the trial resumed.

Defense counsel called Haworth to testify on his own behalf. After answering a few preliminary questions about his background and employment disability, Haworth answered his own counsel's questions concerning their previous discussions about the case:

Q. Now, Steve, you and I have discussed this case a great deal?

A. Yes.

Q. Could you give an idea to the Jury *what I have told you to tell them*?

A. Just to tell the truth, just state facts as they are, and tell the truth. (Emphasis added).

Following this exchange, defense counsel then conducted direct examination about the facts and circumstances of the fight. In several of his answers to questions about the fight, Haworth used the word "cut" in describing what happened. Thus, after describing how he had been knocked down, how the victim Rod Risk had straddled him and had been swinging his fists and hitting him as he lay on his back on the ground, Haworth testified, in relevant part:

A. Well, Rod was swinging and I just moved up to either block his blow. I wasn't going to *cut* him. · He was coming down to hit me again and the next thing I know, blood is going everywhere * * *.

Q. Did you know at that time whether you had *cut* Rod?

A. No, no, and I don't think that he knew that he had been *cut* either because he didn't stop.

*   *   *   *   *   *

Q. Then what happened?

A. Well, like I said, he didn't stop swinging. He didn't know that he had been hurt. I didn't know that I *cut* him except for I did after that initial *cut* because blood came all over me, but that didn't stop him. He kept swinging and kept hitting me. I was just striking out. (Emphasis added).

Following Haworth's direct examination, the prosecutor conducted his cross-examination. He asked several questions covering how Haworth, during the second day of trial while seated in the courtroom and in response to defense counsel's request, had practiced opening the pocketknife with one hand in order to be able to demonstrate the maneuver when he testified on direct examination. Next, the prosecutor asked, without drawing defense counsel's objection, "You have specifically used the word 'cut' versus 'stabbed' in your testimony today, correct?" Haworth answered, "True." The prosecutor then moved on and covered other aspects of Haworth's direct examination testimony concerning the facts and circumstances of the fight.

After Haworth's testimony, the defense rested, the prosecution had no rebuttal, and the evidence was closed.

On the fourth and final day of trial, in the prosecutor's closing argument, he reviewed the testimony of the various witnesses. In his review of Haworth's testimony, the prosecutor said, in relevant part, again without drawing defense counsel's objection:

He is the only witness that you heard from who had to practice his presentation to you. He told you, his testimony was that [defense counsel] wanted me to practice opening the knife before I actually testified.

You know, he told you that he deliberately in his testimony used the word "cut" versus "stabbed."

Following the prosecutor's first phase of closing argument, defense counsel delivered his closing argument. Then, the prosecutor completed the final phase of his closing argument, which contained no further reference to Haworth's having practiced his presentation or deliberately used the word "cut."

After the jury deliberated, it found Haworth guilty. Haworth filed no post-trial motions. This appeal followed.

## DISCUSSION

Haworth asserts the prosecution violated his rights to effective assistance of counsel and a fair trial as guaranteed by the Federal and Wyoming Constitutions. U.S. Const. Amends. V, VI; Wyo. Const. art. 1, §§ 6, 10. He avers this occurred when the government deliberately and surreptitiously invaded the defense camp, learned the nature of the defense strategy which was to use the word "cut" instead of the word "stabbed" to describe Haworth's self-defense use of the pocketknife, and used that information to discredit Haworth on cross-examination and in closing argument by pointing out that Haworth specifically used the word "cut" instead of "stabbed" in his testimony.

■ To support his assertion, Haworth refers this court to respectable authority that appropriately describes the nature and scope of the attorney-client relationship in the criminal setting. We agree that "[t]he essence of the sixth amendment right to effective assistance of counsel is, indeed, privacy of communication with counsel. *Glasser v. United States,* 315 U.S. 60, 62, 62 S.Ct. 457, 461, 86 L.Ed. 680 (1942); *United States v. Rosner,* 485 F.2d 1213, 1224 (2d Cir.1973)." *United States v. Brugman,* 655 F.2d 540, 546 (4th Cir.1981). Like the court in *Rosner,* "[w]e do not lightly regard so serious a constitutional claim [as government intrusion into an accused's right privately and freely to consult his counsel] * * *." *Id.* at 1224. *See also State v. Milligan,* 40 Ohio St.3d 341, 533 N.E.2d 724 (Ohio 1988).

■ We have carefully read the numerous opinions treating the issue of the government's intrusion into the confidential relationship between the criminally accused and defense counsel. They present a variety of fact situations involving undercover agents, government informants, co-defendants, and law enforcement personnel who have either participated in attorney-client meetings, engaged in wiretapping or electronic eavesdropping, or overheard conversations. *See, e.g., Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Brugman,* 655 F.2d 540; *United States v. Irwin,* 612 F.2d 1182 (9th Cir.1980); *United States v. Levy,* 577 F.2d 200 (3rd Cir.1978); *Caldwell v. United States,* 205 F.2d 879 (D.C.Cir.1953); *Coplon v. United States,* 191 F.2d 749 (D.C.Cir.1951); *Blackmon v. State,* 653 P.2d 669 (Alaska Ct.App.1982); *Milligan,* 533 N.E.2d 724. *See also* Annotation, *Propriety of Governmental Eavesdropping on Communications Between Accused and His Attorney,* 44 A.L.R.4th 841 (1986). Although these cases are factually distinguishable from our case at hand, those factual distinctions do not overshadow the important factors which all have in common and are usually considered "[i]n determining whether there has been an invasion such as to be violative of the Sixth Amendment right to effective assistance of counsel * * *." *Brugman,* 655 F.2d at 546.

The four factors are:
1. Whether the government purposely caused the informant's presence in order to obtain confidential information or whether the informant's presence was a result of an innocent occurrence;
2. Whether as a result of the informant's intrusion the government obtained, directly or indirectly, any evidence which the prosecutor then used at trial;
3. Whether as a result of the informant's intrusion the government obtained any other information which the prosecutor then used in any other manner to the substantial detriment of the accused; and

4. Whether the government learned the details about the trial preparation.

*Weatherford,* 429 U.S. at 554, 97 S.Ct. at 843, 51 L.Ed.2d at 39. *See also, Brugman,* 655 F.2d at 546.

■ Considering the opinions in the above and foregoing cases and the nature of the derived factors,

> it is apparent that mere government intrusion into the attorney-client relationship, although not condoned by the court, is not of itself violative of the Sixth Amendment right to counsel. Rather, the right is only violated when the intrusion substantially prejudices the defendant. Prejudice can manifest itself in several ways. It results when evidence gained through the interference is used against the defendant at trial. It also can result from the prosecution's use of confidential information pertaining to the defense plans and strategy, from government influence which destroys the defendant's confidence in his attorney, and from other actions designed to give the prosecution an unfair advantage at trial.

*Irwin,* 612 F.2d at 1186–87.

Having identified the element of substantial prejudice to the accused as being the focus of our overriding concern in this area of the law, we also agree with the authorities that "[t]o determine the precise degree of prejudice sustained by [an accused] as a result of the [government's intrusion] is at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." *Glasser,* 315 U.S. at 75–76, 62 S.Ct. at 467, 86 L.Ed. at 702.

■ Applying the factors identified above to our case at hand and keeping in mind that our overriding concern is whether the accused has been substantially prejudiced, we have determined that, under the facts of this case, the prosecution's intrusion into the attorney-client relationship of Haworth and his defense counsel did not substantially prejudice Haworth's defense. First, the deputy sheriff's presence at the weekend trial preparation sessions with Haworth and defense counsel was not purposely caused by the prosecution in order to obtain privileged information. Second, the only information which the prosecution obtained and used in any manner was that Haworth would consciously employ the word "cut" instead of the word "stabbed" to describe his use of the pocketknife during the fight. The trial judge, however, severely restricted the extent to which the prosecutor could use that information for the purpose of discrediting Haworth's testimony. The prosecutor obeyed the trial court's ruling by not inquiring into that matter "as being quoted from a lawyer to a client." Finally, the only details about trial preparation which the prosecution learned were those relating to the choice of words just mentioned. Although the prosecutor asked one question of Haworth about his choice of the word "cut," and a day later made passing reference about that word choice in closing argument to the jury, use of the word "cut" was *de minimis* considering the nature and amount of the other evidence in the case describing the fight.

In our consideration of whether Haworth was substantially prejudiced, we have also taken into account several factors relating to Haworth's testifying in his own behalf. He voluntarily took the stand. On direct examination, his own counsel opened the door to a potentially much broader and more damaging cross-examination by the prosecutor than actually occurred. His own counsel raised the very subject of their confidential, privileged conversations and asked Haworth to tell the jury what defense counsel told him to say. In answer to that dangerous question, Haworth replied he had only been told to tell the truth. Fortunately for Haworth, the prosecutor did not seize the opportunity and bore in on cross-examination to have Haworth testify fully and completely about the other matter defense counsel told him to say, namely, use the word "cut" instead of the word "stabbed." A consistent line of Wyoming decisions informs us that

> a defendant who has voluntarily testified may be cross-examined the same as any other witness and the latitude of cross-

examination is largely within the discretion of the court. *Porter v. State*, Wyo., 440 P.2d 249, 250 (1968). Cross-examination of a witness is not, however, without its limitations. When cross-examination is not confined to matters testified to in the examination in chief, it must be limited to those things which affect the credibility of the witness. *See, Johnson v. State*, 8 Wyo. 494, 508, 58 P. 761, 764 (1899).

*Roby v. State*, 587 P.2d 641, 644 (Wyo. 1978). And, in a later case we said:

The credibility of a defendant in a criminal case may be tested and his testimony impeached like that of any other witness. When he testifies in his own behalf he has no right to set forth to the jury facts favorable to him without laying himself open to cross-examination upon those facts. *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958).

*MacLaird v. State*, 718 P.2d 41, 47 (Wyo. 1986).

With these principles in mind, we recall that Haworth testified in his own behalf and, as part of his effort to establish self-defense, chose the word "cut" to describe his use of the knife. That testimony on direct examination was properly subject to cross-examination the same as any other witness' direct testimony would be. Here, the prosecutor respected the trial judge's in-chambers rulings in his cross-examination on that specific piece of testimony, making no reference to Haworth's private conversations with his defense counsel during their trial preparation sessions. It is, perhaps, an interesting question whether those judicial rulings continued to apply in light of defense counsel's subsequent direct examination of Haworth in which he opened the door to the subject of his conversations with his client.[4] We need not comment further on that point.

After carefully examining the record and the authorities, we are convinced that the prosecution's one cross-examination question relating to Haworth's choice of words and one closing argument remark to the jury about that matter properly related to matters to which Haworth testified on direct examination. After reviewing the evidence, we do not find that the nature of the question, the answer to it, and the remark to the jury could have had any influence on the jury to materially affect its result in reaching the verdict. Consequently, we hold that the prosecution's intrusion into the attorney-client relationship of Haworth and his defense counsel, under the facts of this case, did not substantially prejudice Haworth's defense.

Affirmed.

URBIGKIT, Justice, dissenting.

This appeal tests the basic morality and integrity of the criminal trial process within Wyoming's judicial system. By this decision, I perceive Wyoming's courts to come up wanting. This case portrays hardball lawyering in a most virulent and divisive fashion.[1] As a morality case, this ap-

---

4. Applegate, *supra* note 3 at 290 n. 52, points out, "Logically, the [attorney-client] privilege should apply only to factual communications *from* the client *to* the lawyer. In practice this distinction is difficult to maintain, because much communication from the lawyer to the client reveals privileged client communications."

With respect to the issue of waiver of the attorney-client privilege, "[a] privilege-holder who testifies * * * at trial about his privileged communications with his attorney * * * waives his right to invoke a privilege against cross-examination or testimony by others with regard to the same matter." *Developments in the Law—Privileged Communications*, 98 Harv. L.Rev. 1450, 1633 (1985).

1. For current law journal review, see Timothy P. Terrell & James H. Wildman, Essay, *Rethinking "Professionalism"*, 41 Emory L.J. 403 (1992); Richard C. Baldwin, Essay, *"Rethinking Professionalism"—And Then Living It!*, 41 Emory L.J. 433 (1992); Jennifer Gerarda Brown, Essay, *Rethinking "The Practice of Law"*, 41 Emory L.J. 451 (1992); Monroe H. Freedman, Essay, *Professionalism in the American Adversary System*, 41 Emory L.J. 467 (1992); Kenneth L. Penegar, Essay, *The Professional Project: A Response to Terrell and Wildman*, 41 Emory L.J. 473 (1992); Robert E. Rodes, Jr., Essay, *Professionalism and Community: A Response to Terrell and Wildman*, 41 Emory L.J. 485 (1992); Jack L. Sammons, Jr. & Linda H. Edwards, Essay, *Honoring the Law in Communities of Force: Terrell and Wildman's Teleology of Practice*, 41 Emory L.J. 489 (1992); Gary L. Monserud, Essay, *A View of*

peal transcends the litigants and, for that matter, their counsel as we examine standards for Wyoming's practice of law.

What happened? Counsel for a defendant involved in a serious assault charge wanted to familiarize his jailed and non-bailed client with the courtroom atmosphere. The sheriff's officialdom agreed that they would cooperate by making available deputy sheriffs to insure custody of the defendant during the courtroom trial preparation if counsel would be responsible to compensate the deputies for the extra duty. Defense counsel states, and it is uncontroverted by any *countervailing sworn evidence*, that he understood confidentiality would be maintained by the deputies regarding attorney/client discussions and trial preparations in the courtroom atmosphere.

What happened next? A deputy sheriff eavesdropped on the trial preparation session and, thereafter, upon the deputy prosecutor's request, recited to him everything that had occurred between the defendant and his attorney. The prosecuting attorney then used his inside knowledge of the trial preparation session for cross-examination at trial.

Consequently, the majority blames defense counsel and excuses the unethical conduct on a substantial prejudice distillation from the abject violation of everything that is basic to an ethical and proper judicial institution. I find this approach totally abhorrent. Standards of both conduct and honesty are clearly dispossessed. This is what we know, from a high volume of present legal literature, as hardball lawyering, about which unrelenting criticism

flows forth from the bench and bar as well as the public media.

We establish a result-oriented standard of conceptualization that nothing is wrong as long as you get by with it. Even Watergate and its fallout, as well as Arms-for-Iran, should have taught us something about this standard of legal ethics and morality.

To provide one partial answer, I would disabuse as acceptable the "get by with it" syndrome and reverse this conviction to require a retrial for justice to be insulated from prosecutorial abuse. I write, strongly, since we may be misperceived as signaling an approval of wired conference rooms and jail interview locations within the sheriff's control. In the past professional experience of Wyoming lawyers, this status was certainly not unknown or not at least unsuspected to seasoned trial counsel who became involved in representation of an accused lacking the resources to bond out of the local jail. This attitude should not now be countenanced to achieve either a disposition affirming at any cost or accepting in "justice delivery" that any injustice is justified to accomplish a conviction. Competent prosecution is faced by perhaps one or, at the most, two acquittals with at least every hundred criminal charges where nine out of ten are resolved by plea and the remaining trials favor conviction. Within these few cases, fairness, honesty and morality are not an undue burden on accomplished justice.[2]

I am concerned that the perspective provided in the majority opinion is that this is a coached witness case. Any competent trial attorney prepares his witnesses, including discussion about the power of

---

*Law From a Transplanted South Dakotan,* 37 S.D.L.Rev. 1 (1992); M.A. Cunningham, Comment, *The Professional Image Standard: An Untold Standard of Admission to the Bar,* 66 Tul. L.Rev. 1015 (1992); Laura K. Thomas, Comment, *Professional Conduct—Lazy Seven Coal Sales, Inc. v. Stone & Hinds, P.C.: The Code of Professional Responsibility as a Basis for Attorney Liability,* 22 Mem.St.U.L.Rev. 169 (1991); Steven Lubet, Short Story, *Civility: A Tale of Deconstruction and Constraint,* 1992 Wis.L.Rev. 157 (1992); and Timothy W. Floyd, *Realism, Responsibility, and the Good Lawyer: Niebuhri-*

*an Perspectives on Legal Ethics,* 67 Notre Dame L.Rev. 587 (1992).

**2.** General statistics by competent and scholarly journal analyses reveal that on average, at least ninety percent of all criminal charges filed are resolved without trial. Total acquittals for those few cases tried from district courts in Wyoming run somewhere around one to two in ten trials and particularly so where competently prepared prosecutors are involved, no matter what the expertise of defense counsel may be.

words. Tort plaintiffs talk about the "horrible crash" and the blood and broken bones while defense counsel address the "accident" and the unavoidable incident resulting from something other than the negligence of their insured.

Anyone who thinks that jurors are unaware of emotionally impactful words has little faith in the intelligence of our citizenry. To demonstrate a contended lack of prejudice from trial error to the accused could be, linguistically, "a weasel worded concept created to cover up and hide lies, broken agreements and prosecutorial unethical conduct constituting hardball lawyering." Alternatively defined, harmless error is, "only a status that the defendant is entitled to a fair trial and not a perfect trial and defendant's perception of error was, in any event, only harmless." Either way, we address the same problem of recognized trial error. The power of words is applied for a result-oriented conclusion in both cases.[3]

I doubt that anyone with experience practicing law in Wyoming will be ethically convinced that the conduct of the deputy sheriff, followed with the use of the information by the deputy prosecutor, can provide honor, acclaim or respectability to this state's judicial system. "Anything goes" is not my criteria of our profession nor will I accept this standard as the ethical mainline

---

**3.** There is a tone touching incredulity if not incredibility regarding adverse connotations when competent counsel adequately prepares for trial. The scapegoat that appears in the appeal about inappropriate counsel preparation of the principal witness is nothing less than a patent absurdity. Experienced trial counsel are expected to do no less than to provide support, direction and assistance to witnesses, provided only that a direction of what may be said is not suggested or required. A significant and well-edited publication carries a thoughtful and comprehensive guide for attorneys. The publication itself provides guidance and by it, it is demonstrable that here, defense counsel was trying to properly do his job as counsel. Suborning perjury is different from education of the witness about the power of words, whether "cut", "stab," or "accidentally strike in self defense."

The author of the trial publication text first instructs regarding preparing your witness:

Do not expect the checklist and the video to do your work for you. They merely supplement the fundamental and critical face-to-face witness preparation, which should include the following steps, in whatever sequence best suits the personal style of the lawyer and the witness.

Orient the witness to the nature of deposition or trial testimony, describing who will be there, the physical arrangements, the personality and style of opposing counsel, and the importance of the preparation which is about to begin. Review the checklist guidelines for the first time, expanding them with both general and case-specific examples. Analyze the issues, claims, and defenses with which the witness is concerned, the witness's knowledge of the facts, and ask him or her to identify expected problem areas about which he feels uncomfortable testifying. The witness then views the videotape and hears the guidelines for the second time. Counsel and the witness then review together all his prior statements and discovery responses, all relevant documents, and any relevant physical evidence, including, as necessary, inspection of a product or the scene of an event.

If the witness has previously given testimony in other cases, review those transcripts, if available, with the witness to note his or her adherence to the testimony guidelines. If he is to appear with documents pursuant to a subpoena or a notice to produce, review that request and the proposed response.

The next phase is a practice session of question-and-answer direct and cross examination. This is interrupted and disjointed for clarification of the answers, reminders of guidelines violated, and discovery of areas where the witness must volunteer explanations in addition to simple yes or no answers to make the testimony accurate and truthful.

The witness then goes through a formal mock examination, sometimes with participation by another attorney for direct or cross. Keep a scorecard of guideline violations, without interrupting the examination. During the formal mock examination, always include some questions not previously discussed and, if possible, introduce a document not previously reviewed, relevant or otherwise, to test the witness's ability to deal with new matters. [Following further recommendations, the author then provided thirty-four suggestions for giving accurate testimony with his checklist for the witness.]

William B. Fitzgerald, *Preparing Your Witness*, 34 For the Defense 16, 16–17 (July 1992).

We should not need this excellent guidance to recognize that comprehensive, careful and detailed preparatory work and advance examination with any important witness is just not significant, it is the essence of competency in the practice of law. That careful effort by defense counsel provides no moral or ethical opportunity for justification of what the deputy prosecutor did in this case by invading the attorney/client privilege.

of a great profession which each of us has a responsibility to maintain.

The tragedy, and likely the travesty, of this appeal is that again this court determines a case with only half the facts. The decisional process used broadcasts not only the unanswered but really unaddressed question—where is the truth—the public defender's claim of confidentiality, the deputy prosecuting attorney's response, or the hearsay attributed to the deputy sheriff who became the critical figure in the events but was never brought before the district court to explain what did happen and what assurances of confidentiality he provided.

Intrinsic to any adequate analysis of applicable law would be some recitation of how those issues were factually created during this litigative process. Unfortunately, like *Brown v. State,* 816 P.2d 818 (Wyo.1991); *Cooney v. Park County,* 792 P.2d 1287 (Wyo.1990), *cert. granted and judgment vacated* —— U.S. ——, 111 S.Ct. 2820, 115 L.Ed.2d 965 (1991); and *Gale v. State,* 792 P.2d 570 (Wyo.1990), we again adjudicate in ignorance.

What we do know is Steven Haworth was in jail, charged with a knife-involved aggravated assault. His participation is not at issue. The questions are was it self defense or was it inappropriate aggression?

Unable to post bond, Haworth was appointed a public defender to serve as his counsel. This was May, 1990 and the public defender had been admitted to practice law for about two years following graduation from the University of Wyoming College of Law. Recognizing the difficulty of the case and his somewhat limited experience, the attorney undertook a program of familiarization with the courtroom and concurrent trial preparation of his client in order to meet desired standards of trial preparation. The public defender decided to hold a preparatory session with his client in the courtroom rather than in the jail. The sheriff's office was willing to cooperate, provided the public defender's office would be responsible for paying the deputy sheriffs' off-duty special compensation for their services and being present during the courtroom activities so Haworth would not inappropriately depart. Apparently, there were actually two deputies present, but the second person was not named or quoted by the prosecution in the succeeding court comments and statements. And so the trial preparation session was held in the big courtroom of the Natrona County, Wyoming courthouse.

That is as far as we get in established facts, except one more item. The deputy prosecutor found out that the public defender had conducted Haworth's conference and trial preparation session in the courtroom and called one of the deputy sheriffs to find out "what had gone on." Obviously, as the subject was explained on the record, the deputy sheriff, after being employed by the public defender, was asked by the deputy prosecutor to report on what had occurred. The trial court accepted the deputy prosecutor's hearsay contention that the deputy sheriff did just that and described everything he had seen and heard during the extended attorney/client courtroom trial preparation session. The deputy prosecutor used the confidential information in both his preparation and trial examination.

What do we not know? The deputy prosecutor did not testify under the punitive constraints of disbarment or felony perjury about what he said to the deputy sheriff regarding the information obtained or what the deputy sheriff said about requested confidentiality asked of him by the public defender. The deputy sheriff was not brought before the trial court, put under oath, or otherwise examined to obtain a factual recitation of his involvement.

The contradictory statements reveal the trial court did not have the whole truth. The deputy prosecutor reported to the trial court that the deputy sheriff told the deputy prosecutor that he, the deputy sheriff, had told the public defender: " 'Yes, I will tell people what is going on here. I will tell them.' " The trial court accepted this hearsay upon hearsay statement for the truth of the matter asserted. The public defender responded: "100 percent opposite, Your Honor.", emphatically and categori-

cally stating that he had understood confidentiality would be maintained and he had so stated to the deputy sheriff.

The problem with which we are faced is that one of the two attorneys, or perhaps also the deputy sheriff, did not tell the whole truth. The trouble is that the deputy sheriff was not called to testify under oath to defend the statements attributed to him.

Either, we have egregious incompetency of defense counsel in deliberately exposing his client to prejudicial repercussions at trial, or, competent, well-intended and entirely proper efforts aborted and prostituted by the prosecutorial invasion of attorney/client confidentiality. This record does not preclusively establish, which scenario is correct?[4] This question should be tested by partial remand for a fact finding hearing with sworn testimony. *People v. Boone*, 51 A.D.2d 25, 379 N.Y.S.2d 181 (1976); *State v. Milligan*, 40 Ohio St.3d 341, 533 N.E.2d 724 (1988). If not that, then formal disciplinary review by the Wyoming Board of Professional Responsibility seems imperative. *See Brooks v. Zebre*, 792 P.2d 196 (Wyo.1990).

One does have to recognize the improper witness coaching counterattack is a not unusual response to Haworth's contentions about prosecutorial misconduct. I doubt that any prosecutor would want trial preparation conferences of police officers with prosecuting attorneys to be recorded for pretrial review and opposition strategy planning by defense counsel.

This record establishes that the trial court was appalled with the communication between the deputy sheriff and the deputy prosecutor and the deputy prosecutor's intended use for trial benefit. The part of the record where the subject was considered reflects:

THE COURT: I have ruled on that.

I want to know about this conversation with the deputy.

[PUBLIC DEFENDER]: Your Honor, I told both those deputies flat out, I said you realize that you are working for me and none of this goes out of this room. I had no—

I don't have any options, Your Honor. I get him in there or—

THE COURT: That is not a question in my mind. I think that that deputy should not be conveying—

[PUBLIC DEFENDER]: I agree wholeheartedly.

THE COURT: But now counsel says, you mean I can't ask him if anybody told him what words to use in his testimony?

[PUBLIC DEFENDER]: Your Honor, any time that you sit down and prepare a witness, I think if an attorney is doing a good and proper job, if my client is kind of gnarly and wants to say profanities all through his prosecution, what we are going to have is have my client being basically prejudiced by his own language. In telling him, sir, when you testify, try not to use profanity, I am not objectively altering his testimony. When I say, sir, instead of the word cut, try to think about the word stab—

THE COURT: Well—

[PUBLIC DEFENDER]: —I am not altering his testimony because it is very obvious that the individual did that. What we are trying to do is basically give him the language skills that he needs to move forward.

THE COURT: I think there are ways that the State is protected in their cross examination to get at what you are getting at. I think in view of the fact that the information of someone telling him, you know, the play on words, whether it

---

4. There is a rule of reliability of fact called probabilities analysis. What is probable is likely true, what is improbable is most likely untrue. The more improbable a contention may be, the more likely the determiner can establish between two contentions of conflicting factual witnesses which one is not telling the truth since what is probably true, will normally be true. That the defense counsel did not seek or expect trial preparation session confidentiality belies belief. That the deputy sheriff was coached and cajoled into a breach of that confidentiality is highly probable, since the deputy sheriff was "available" and within the control of the prosecution. His absence can be accorded the missing witness presumption of unfavorable testimony. *Hildebrand v. Chicago, B. & Q.R.R.*, 45 Wyo. 175, 17 P.2d 651 (1933).

is stabbed or cut, resulted from a conveyance of information by the deputy that had to be there. In other words, the Defendant has to prepare his case and I suppose that had you called me, I would have said, shackle him and have the deputy step outside. But nobody called me. I don't know whether you would be aware that that possibility existed, but anyhow, I can see that that is not—And what we are after here is a fair trial, and whether it be the State or the Defendant.

*That just strikes me as being unfair. Not only that, but it strikes me as being a potential reversible error.*

I think you can get at it in cross examination without referring to the conversations between counsel and the Defendant. That would be my ruling.

[PROSECUTOR]: My question will be, Your Honor, and I'll give it to you now because I don't want to—You have been specifically instructed to use the word "cut" versus "stabbed?"

[PUBLIC DEFENDER]: That comes straight out of my work product.

THE COURT: That, I find, is objectionable.

[OTHER DEFENSE COUNSEL]: Judge, for purposes of the record and as the Senior Assistant Public Defender, the Natrona County Sheriff would not allow a jailer to come down in to the Courtroom with Mr. Haworth because he can't make bond, and we made arrangements through our fiscal officer in Cheyenne, the Public Defender Fiscal Office. The Public Defender's office is paying Deputy [sheriff] for his overtime in coming down here during that period of time and that is—

THE COURT: *Well, like I say, it just strikes me as unfair.*

(Emphasis added.)

The confidentiality requirements of an attorney and his employees is not only established by ethical prohibitions and obligations, *see, e.g.,* Wyoming Rules of Pro-

fessional Conduct for Attorneys at Law, Rule 1.6, but also from a long history of privilege against use in evidence. *Taylor v. Taylor,* 179 Ga. 691, 177 S.E. 582 (1934). In this case, the deputy sheriff, when accepting the separate employment, should have been subject to the ethical responsibilities and the legal obligations attendant an employee of the attorney. If the deputy prosecutor provided legal advice in contravention of that obligation, a further serious ethical violation by the deputy prosecutor would additionally have occurred under the requirements of Wyoming Rules of Professional Conduct, Rule 3.3, "mak[ing] a false statement of material fact * * * to a tribunal." This constraint of the standards of responsibility of practicing attorneys unfavorably addresses counsel lying to the court. *See also* Wyoming Rules of Professional Conduct, Rule 3.4, involving fairness to the opposing party and litigant counsel, among other things, offering an inducement that is prohibited by law. Candor and fairness are not inconsequential responsibilities. *See also* The National District Attorneys Association, *National Prosecution Standards* § 6.5 (2d ed. 1991).

The law review article regarding privileged communications quoted in the majority opinion manages to encumber 216 pages of text without significantly or even directly considering a legal profession standard of honesty or basic ethical foundations for the practice of law. Developments in the Law, *Privileged Communications,* 98 Harv.L.Rev. 1450 (1985). Unfortunately, that omission of morality concerns and disposition of ethical responsibilities is recreated in its logically absurd and moral vacuity by this court's opinion citation. Incredibly, in the pristine absence of reason or logic, the law review stated, without a single citation of authority for substantiation, a concept that violated confidences of the lawyer lacked significance unless occurring within the courtroom.[5] This is worse than

---

5. Among many infinitely questionable statements contained in the "anything goes" precept of the Harvard Law Review article, there are two sentences that reach Orwellian logic:

When disclosure occurs [of communications between attorney and client] and confidentiality is to some degree compromised, it does not necessarily follow that the values promoted and protected by confidentiality are corre-

the law of the jungle. It is an invitation to debase morality. Even worse is the present epidemic of hardball lawyering, pervasive if not constituting a terminal disease. Evil, of course, debases the procurer most of all.

In his recent dissent, Justice Stevens stated in *United States v. Williams*, —— U.S. ——, 112 S.Ct. 1735, 1749, 118 L.Ed.2d 352 (1992):

> Like the Hydra slain by Hercules, prosecutorial misconduct has many heads. Some are cataloged in Justice Sutherland's classic opinion for the Court in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935):

> > "That the United States prosecuting attorney overstepped the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense is clearly shown by the record. He was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and in general, of conducting himself in a thoroughly indecorous and improper manner....

> > "The prosecuting attorney's argument to the jury was undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury." *Id.*, at 84–85, 55 S.Ct., at 631–632.

> This, of course, is not an exhaustive list of the kinds of improper tactics that over-zealous or misguided prose-

cutors have adopted in judicial proceedings. The reported cases of this Court alone contain examples of the knowing use of perjured testimony, *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), the suppression of evidence favorable to an accused person, *Brady v. Maryland*, 373 U.S. 83, 87–88, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), and misstatements of the law in argument to the jury, *Caldwell v. Mississippi*, 472 U.S. 320, 336, 105 S.Ct. 2633, 2643, 86 L.Ed.2d 231 (1985), to name just a few.

It is noteworthy that the quotation of Justice Sutherland and his long list of tactics of misconduct fall far short of what we have here which is intervention to disrupt attorney/client confidentiality in trial preparation.

It is sad, when writing as a state Supreme Court jurist, that the United States Supreme Court is so frequently called as the arbiter to justice to understand and enforce due process, fairness and morality as concepts equally involved in both state criminal court proceedings and the federal court prosecutions. As constitutional law under the United States Constitution has matured and solidified, the general dedication to due process in criminal prosecutions has remained unquestioned. A consistency in delineation, however, may not be necessarily demonstrable.

A quick search to see how courts are required to define and provide constitutional rights to the criminally charged in this context of prosecutorial overreaching is surely informative, and tragically relevant. "[O]ne of the primary or core functions of [the state Supreme Court] is to ensure that each criminal defendant receives a fair trial." *State v. Olson*, 482 N.W.2d 212, 21592048917 (Minn.1992).

In *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), the federal conviction was reversed where the

spondingly undermined. For example, the effective assistance of counsel is virtually never undermined except by breach of confidentiality in court, because no disclosure short of evidentiary use of the communication against

the communicant in a court of law will chill attorney-client communications.
Developments in the Law, *supra,* 98 Harv.L.Rev. at 1644 (footnote omitted).

United States attorney misstated the facts in cross-examination, put words in the mouth of the witnesses which were unsaid, of pretending, suggesting, bullying and arguing with the witness. This case followed *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), where the state court permitted knowing use of perjured testimony which was found to be an actionable due process injury.[6]

These cases were followed by *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), recognizing that a right to counsel was eviscerated by a conflict of interest disability; *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), where the prosecutor failed to correct perjured testimony; *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the state court denied assistance of counsel to the indigent defendant; *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), involving the bugged automobile and alleged incriminating statements "deliberately elicited [by federal agents] from [the defendant] after he had been indicted and in the absence of his counsel;" *Black v. United States,* 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966), surreptitiously intercepting conversations between counsel and defendant by concealed jail monitoring device; *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), law enforcement officers induced a friend of the defendant to insinuate himself into the defendant's entourage in order to spy for the prosecutors;[7] *O'Brien v. United States,* 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967), electronic eavesdropping installed without a warrant in the commercial establishment of defendant's acquaintance; *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), post-indictment lineup conducted in the absence of counsel; *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), state court plea agreement breached by the prosecuting attorney; *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), due process denial of right of defense counsel to make final argument as justified by state statute; and *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), trial court order denying defendant's counsel right to confer during the overnight recess. *Cf. Perry v. Leeke,* 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989), fifteen minute recess during the day.

These introductory cases then brought the court to *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), where a confederate informer as a spy provided informational access into attorney/client conferences with the case arising as a 42 U.S.C. § 1983 civil rights pro-

---

**6.** The *Mooney* opinion really defined due process as a irreplaceable ingredient of ordered justice:

> Without attempting at this time to deal with the question at length, we deem it sufficient for the present purpose to say that we are unable to approve this narrow view of the requirement of due process. That requirement, in safeguarding the liberty of the citizen against deprivation through the action of the State, embodies the fundamental conceptions of justice which lie at the base of our civil and political institutions. *Hebert v. Louisiana,* 272 U.S. 312, 316, 317 [47 S.Ct. 103, 104, 71 L.Ed. 270]. It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.

*Mooney,* 294 U.S. at 112, 55 S.Ct. at 341–342.

**7.** Justice Douglas, responding in appeal dismissal concurrence in *Hoffa* and dissenting in *Osborn v. United States,* 385 U.S. 323, 87 S.Ct. 429, 439, 17 L.Ed.2d 394 (1966) and *Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), perceptively worried:

> These examples and many others demonstrate an alarming trend whereby the privacy and dignity of our citizens is being whittled away by sometimes imperceptible steps. Taken individually, each step may be of little consequence. But when viewed as a whole, there begins to emerge a society quite unlike any we have seen—a society in which government may intrude into the secret regions of man's life at will.

*Osborn,* 385 U.S. at 343, 87 S.Ct. at 440.

ceeding; *Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977), *cert. denied* 440 U.S. 919, 99 S.Ct. 1242, 59 L.Ed.2d 471 (1979), represented defendant identified by the victim at a preliminary hearing when defendant's counsel was not present; *United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), federal agent meeting with represented defendant in absence of attorney seeking "cooperation;" and *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), wired agent of police seeks inculpatory statement of co-defendant as a violation to right of counsel after indictment. Conversely, prosecutors in federal courts have no obligation in presentations to the grand jury to fairly present favorable as well as unfavorable evidence. *Williams,* — U.S. ——, 112 S.Ct. 1735.

The character of activities recognized in case law where law enforcement officials or prosecutors seek to acquire leverage in litigative advantage is almost endless, even if we exclude accidental exposures to conference contacts or telephone calls between attorneys and clients. I ask, in deep concern, where do we choose to draw the line? To which of the following will the judiciary emphatically "just say no" as permitted prosecutorial conduct: telephone tap on calls from client to attorney, *Coplon v. United States,* 191 F.2d 749 (D.C.Cir.1951), *cert. denied* 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952); recording courtroom communications at the desk between the attorney and his client by pointing a microphone in the direction of opposing litigant, *South Dakota v. Long,* 465 F.2d 65 (8th Cir.1972), *cert. denied* 409 U.S. 1130, 93 S.Ct. 951, 35 L.Ed.2d 263 (1973); bugging the attorney's place of conference, his office or the client's home or business, *Black,* 385 U.S. 26, 87 S.Ct. 190; *O'Brien,* 386 U.S. 345, 87 S.Ct. 1158; listening to confidential discussions by moving within earshot when the client talks to his attorney, *Mastrian v. McManus,* 554 F.2d 813 (8th Cir.), *cert. denied* 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977); requesting that the defendant, without contact with his counsel, become an undercover informer for other contended crimes involving the same

course of activities, *Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564; *United States v. Irwin,* 612 F.2d 1182 (9th Cir. 1980); *United States v. Walker,* 839 F.2d 1483 (11th Cir.1988); planted spy in the conferences between defendant and counsel with identity revealed, listening to strategy sessions between the defendant and his attorney, *Weatherford,* 429 U.S. 545, 97 S.Ct. 837; *Moulton,* 474 U.S. 159, 106 S.Ct. 477; *Caldwell v. United States,* 205 F.2d 879 (D.C.Cir.1953); *United States v. Zarzour,* 432 F.2d 1 (5th Cir.1970); *United States v. Mastroianni,* 749 F.2d 900 (1st Cir.1984); co-defendant turns and communicates defense strategy to prosecutor, *United States v. Levy,* 577 F.2d 200 (3rd Cir.1978); *cf. United States v. Brugman,* 655 F.2d 540 (4th Cir.1981); happenstance monitoring effort which intercepts calls with attorney, *United States v. Brown,* 484 F.2d 418 (5th Cir.1973), *cert. denied* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974); and informant with recorder hides in the closet while attorney and client discuss trial strategy, *United States v. Gartner,* 518 F.2d 633 (2d Cir.), *cert. denied* 423 U.S. 915, 96 S.Ct. 222, 46 L.Ed.2d 144 (1975).

These prosecutorial overreaching cases are not confined to the federal forum. Denial of the right for defendant in custody to confer in private with his counsel required the conviction to be set aside in *State v. Holland,* 147 Ariz. 453, 711 P.2d 592 (1985); admission of confidential trial site attorney/client discussion by eavesdropping police witness required conviction reversal in *Blackmon v. State,* 653 P.2d 669 (Alaska App.1982); frequently used jail conference room bugged, *Fajeriak v. State,* 520 P.2d 795 (Alaska 1974) (remanded for proper evidentiary hearing to determine what occurred, if confidentiality breached, retrial to be required with information and benefit from information to be excluded); jail conference room for attorney/client meetings had two-way search mirrors enabling use of information obtained in the conference required case reversal in *People v. Harfmann,* 38 Colo.App. 19, 555 P.2d 187 (1976); agreement regarding use of video

tape breached, evidence suppressed, *People v. Fisher*, 657 P.2d 922 (Colo.1983); among a group of protest arrestees, there were undercover police officers who attended joint strategy sessions of defendant after arrest resulting in charges dismissed in strong analysis of the right to counsel and the importance of confidentiality, *Barber v. Municipal Court For San Luis Obispo County Judicial Dist. of San Luis Obispo County*, 24 Cal.3d 742, 157 Cal.Rptr. 658, 598 P.2d 818 (1979); taped discussion between attorney and client in jail conference room, *Wilson v. Superior Court, In and For Los Angeles County*, 70 Cal.App.3d 751, 139 Cal.Rptr. 61 (1977) (where an interesting remedy was provided that no cross-examination of the defendant was permitted, no rebuttal testimony authorized, no use of the information justified directly or indirectly); tampering with the attorney requiring the defendant fire his attorney to be considered for a plea bargain, *Boulas v. Superior Court*, 188 Cal.App.3d 422, 233 Cal.Rptr. 487 (1986); microphone in jail conference room freely used to listen to attorney and defendant, *State v. Cory*, 62 Wash.2d 371, 382 P.2d 1019 (1963); *see also State v. Grant*, 9 Wash.App. 260, 511 P.2d 1013 (1973), *cert. denied* 419 U.S. 849, 95 S.Ct. 87, 42 L.Ed.2d 78 (1974) (where tainted evidence carefully excluded from trial) and *State v. Baker*, 78 Wash.2d 327, 474 P.2d 254 (1970); state would have the burden of providing evidence for conviction not found from that evidence which was obtained as a result of the illegally monitored conversations, *Holland*, 711 P.2d 592; counsel denied right to talk to client in private, *In re Rider*, 50 Cal.App. 797, 195 P. 965 (1920); *State ex rel. Tucker v. Davis*, 9 Okl.Cr. 94, 130 P. 962 (1913).[8]

Tape recording of conference between the defendant and his counsel was permitted in *State v. Sugar*, 100 N.J. 214, 495 A.2d 90 (1985), *cert. denied* 122 N.J. 187, 584 A.2d 247 (1990). *See also State v. Sugar*, 84 N.J. 1, 417 A.2d 474 (1980), *cert. denied* 122 N.J. 187, 584 A.2d 247 (1990). The remedy provided in the second appeal where the conviction was reversed was to exclude the offending police officer as a witness at the trial. As a tainted witness, he became ineligible to testify.

Connecticut was similarly faced with an eavesdropping case in *State v. Ferrell*, 191 Conn. 37, 463 A.2d 573 (1983). A *Miranda* violation occurred and the resulting conviction was reversed. *People v. Knippenberg*, 66 Ill.2d 276, 6 Ill.Dec. 46, 362 N.E.2d 681 (1977) involved the impeachment use of confidential communication between defendant and defendant's investigator. The written summary of the investigator's conference report was "somehow" obtained by the prosecution without the knowledge of either the defendant or his counsel which resulted in the reversal of the conviction.

In an Ohio case, a deputy sheriff stood close to a defendant who was talking to his attorney on the telephone and "secretly taped his remarks"—a constitutional violation resulted. Anything learned was suppressed. The court discerned that neither

---

8. In *In re Rider*, the court quoted from the earlier Oklahoma decision in *Davis*:

"It would be a cheap subterfuge of and a shameless mockery upon justice for the state to put a man on trial in its courts, charged with an offense which involved his life, liberty, or character, and then place him in such a position that he could not prepare to make his defense. It would be just as reasonable to place shackles upon a man's limbs, and then tell him that it is his right and duty to defend himself against an impending physical assault. If the right of defense exists, it includes and carries with it the right of such freedom of action as is essential and necessary to make such defense complete. In fact, there can be no such thing as a legal trial, unless both parties are allowed a reasonable opportunity to prepare to vindicate their rights. * * * It

therefore necessarily follows that it is the absolute right of parties charged with crime to consult privately with their attorneys, and that it is an illegal abridgment of this right for a sheriff, jailer, or other officer to deny to a defendant the right to consult his attorneys, except in the presence of such officer. * * * It is the duty of officers having the custody of persons charged with crime to afford them a reasonable opportunity to privately consult with their attorneys, without having other persons present, taking such precautions as may be necessary, according to the circumstances of each case, to prevent the escape of such prisoner." *State ex rel. Tucker v. Davis*, 9 Okl.Cr. 94, 130 Pac. 962, 44 L.R.A. (N.S.) 1083.

*In re Rider*, 195 P. at 965–66.

mere suppression nor dismissal was appropriate in every case irrespective of the circumstances. The state's burden was to demonstrate that there was no prejudice to the defendant. *Milligan*, 533 N.E.2d 724. The use of an undisclosed police agent to attend attorney/client conference to obtain information required dismissal of the criminal charge in *Graddick v. State*, 408 So.2d 533 (Ala.Cr.App.1981), *cert. denied* 458 U.S. 1106, 102 S.Ct. 3483, 73 L.Ed.2d 1366 (1982). The taint could not be neutralized. Surreptitious electronic interception by police of attorney/client communication and defense strategy was discussed in *Matter of Kozak*, 256 N.W.2d 717 (S.D.1977). The case provided a curious distinction between use of electronics or informants, but the pretrial remedy was an extensive disclosure and rights of suppression thereafter. Likewise, surreptitious taping of telephone calls between attorney and client in jail was present in *Milligan*, 533 N.E.2d 724.

An undercover agent was wired to obtain information at defendant/counsel conferences—a federal constitutional violation—in *People v. Squitieri*, 49 A.D.2d 374, 375 N.Y.S.2d 124 (1975). The conviction was reversed for retrial and a suppression motion granted. General business office telephones were bugged and telephone calls were recorded in *People v. Morhouse*, 21 N.Y.2d 66, 286 N.Y.S.2d 657, 233 N.E.2d 705 (1967). Telephone calls were overheard by police and a hearing was required to consider depravation of opportunity for private conversation in *Boone*, 379 N.Y.S.2d 181. *Cf. People v. Harris*, 57 N.Y.2d 335, 456 N.Y.S.2d 694, 442 N.E.2d 1205 (1982), *cert. denied* 460 U.S. 1047, 103 S.Ct. 1448, 75 L.Ed.2d 803 (1983), overheard telephone call to attorney, considered defendant's choice to speak in presence of the police.

There is a strong and clearly identifiable connection and trend among this illustrative example of cases. First, strongly condemned prosecutorial misconduct had occurred. Additionally, and not secondly, action was required which included reversal or suppression or a fact finding hearing for most cases.

No extended search was required to develop this sample of cases reflecting prosecutorial efforts, in one way or another, that invade the confidentiality between the defendant and his attorney; the listed cases are only illustrative and not exhaustive. No less illustrative and even more so persuasive or decisive should be the strong and effective retributive action taken by the judiciary to do two things: (a) assure justice in the instant case; and (b) teach a lesson of the improvidence of any continued practice. I absolutely rebel at the prospect of returning to bugged conference rooms in Wyoming county jails. No less offensive to me is the conduct of the kind represented in this case where the deputy prosecutor's direction of activity was to surreptitiously obtain "leverage" rather than use the established adjudicatory processes and submit the issue for jury resolution for a fair determination of guilt or innocence. "Anything goes" should not be the tenant by which we obtain criminal convictions. It is more than a matter of passing concern that those among our citizenry who are first to criticize the operational jury system are the last to condemn overreaching and prosecutorial dissection of the Bill of Rights protections provided in the state and federal constitutions.

I am disturbed because surely anyone who has modest experience in the current practice knows that what the deputy prosecutor did in this case was totally inappropriate. Moral, efficient and highly successful prosecutors, of which the number are many in the Wyoming adjudicatory system, need not resort to tactics of this character. I write in concern because we may, by opinions such as this in justifying conviction, also demean the morality and the honor of the system dedicated to justice. National District Attorneys Association, *supra*, at 21, commentary, states it well:

> The prosecutor's obligation to comply with the ethical code and rules of his jurisdiction is a fundamental and minimal requirement. When the prosecutor falls below that standard, he may expect sanctions impacting upon a particular case or on the individual prosecutor.

However, the dignity and honor of the profession call for compliance with a higher standard of conduct, one of professionalism. This standard requires the prosecutor to bring integrity, fairness, and courtesy into all interactions, be they with opposing counsel, the court, jurors, or the defendants.

The present American societal discord between rational and historical standards of ethical conduct which come into conflict with desired efficiencies and effectiveness for prosecution is not unnoticed as a major battle of contemporary American criminal law. *See* Symposium, 53 U.Pitt.L.Rev. 271 (1992).[9] For those of us who recall the explosive growth and pervasive encroachment of the totalitarian approach to judicial rights of fifty or sixty years ago, we cannot view with anything but horror and extreme consternation academic analyses such as provided in the University of Pittsburgh Law Review Symposium.

Whatever may be the functionality or factor of the new mode of federal law prosecution and immoral counsel conduct, we need not overlay the Wyoming judicial system with an equal character of result-oriented disregard of fairness, ethics and constitutional rights. It would be well to take heed of what Bennett L. Gershman concluded in his contribution to the University of Pittsburgh Law Review Symposium:

> This article attempted to describe the recent accretion of power by prosecutors, the effect it has had on the adversary system, and the failure of judicial or disciplinary bodies to restrain prosecutorial excesses. Given the well-documented existence of misconduct, the current laisez-faire attitude of the courts, and the disappointing response of professional grievance committees, there is a potential for even greater misuse of "the awful instruments of the criminal law."

Bennett L. Gershman, *The New Prosecutors,* 53 U.Pitt.L.Rev. 393, 458 (1992) (quoting *McNabb v. United States,* 318 U.S. 332, 343, 63 S.Ct. 608, 614, 87 L.Ed. 819 (1943)).

I dissent in supposition that the best place to start in Wyoming is reversal and remand of a conviction where prosecutorial misconduct is not just apparent, but undeniable. Harmless error escapes are not an appropriate way to address abject failures in ethics and integrity. Even before that occurs, I would like to have the testimony of the attorneys and law enforcement personnel *on the record, under oath,* and within felony conviction exposure if perjury is committed by the participants.

The more academic problem with the majority decision as it considers deliberate prosecutorial intrusion into the confidentiality of defense counsel and his client is that no rule is provided whether prophylactic or per se. Furthermore, no consideration is given to excuse or justify motivation. Even more emphatically, I am concerned about a failure to analyze and apply specific provisions of Wyoming's Code of Professional Conduct and the due process guarantees of our state constitution. To put the topic in perspective, if we rely wholly on federal law precepts, 2 Wayne R. LaFave and Jerold H. Israel, *Criminal Procedure* § 11.8, at 74–76 (1984) (footnotes omitted) would provide some thoughtful perspective:

> The basic issue presented in *Weatherford v. Bursey* was whether the Supreme Court would adopt what it described as a "per se" or "prophylactic rule." The lower court had adopted such a rule. Relying on Supreme Court precedent, it had held that "whenever the prosecution knowingly arranges or permits intrusions into the attorney-client relationship the right to counsel is sufficiently endan-

**9.** The articles in the Symposium include: John M. Burkoff, *Prosecutorial Ethics: The Duty Not "To Strike Foul Blows",* 53 U.Pitt.L.Rev. 271 (1992); Roger C. Cramton & Lisa K. Udell, *State Ethics Rules and Federal Prosecutors: The Controversies Over the Anti–Contact and Subpoena Rules,* 53 U.Pitt.L.Rev. 291 (1992); Bennett L. Gershman, *The New Prosecutors,* 53 U.Pitt.L.Rev. 393 (1992); F. Dennis Saylor, IV &

J. Douglas Wilson, *Putting a Square Peg in a Round Hole: The Application of Model Rule 4.2 to Federal Prosecutors,* 53 U.Pitt.L.Rev. 459 (1992); Andrea F. McKenna, *A Prosecutor's Reconsideration of Rule 3.10,* 53 U.Pitt.L.Rev. 489 (1992); and Nancy J. Moore, *Intra–Professional Warfare Between Prosecutors and Defense Attorneys: A Plea for an End to the Current Hostilities,* 53 U.Pitt.L.Rev. 515 (1992).

gered to require reversal and a new trial." A divided Supreme Court held that the lower court had misread the relevant precedent and had adopted a rule that failed to give sufficient weight to the "necessity of undercover work and the value it often is to effective law enforcement." * * *

*Weatherford's* conclusion that a state invasion of the lawyer-client relationship does not violate the Sixth Amendment unless there is at least a realistic likelihood of a governmental advantage arguably was limited to cases in which there was a significant justification for the invasion. In *United States v. Morrison*, the Court dealt with an invasion that lacked any significant justification. In that case, D.E.A. agents, although aware that the defendant had been indicted and had retained counsel, met with her without defense counsel's knowledge or permission, and while seeking her cooperation, disparaged her retained attorney. The court of appeals held that defendant's right to counsel was violated irrespective of allegation or proof of prejudice to her case, and that the only appropriate remedy was a dismissal of the prosecution with prejudice. The Supreme Court unanimously reversed. * * *

* * * * * *

In declining to reach the government's contention that a showing of prejudice would be needed to establish a Sixth Amendment violation, the *Morrison* opinion left open the possibility that the Court might adopt a per se standard for those state invasions of the lawyer-client relationship that are not supported by any legitimate state motivation.

I find here neither cogent case law analysis justifying the confidentiality intrusion nor abiding principles upon which the justice delivery system, including investigative officers, prosecutors, defense counsel and our courts, can rely to provide the standard of morality and fairness we are directed to require. That is the "support, obey and defend" responsibilities of Wyo.Const. art. 6, § 20. My particular problem with the majority decision is the absence of a discussion of ethics and legal morality.

I respectfully dissent—with anguish and concern.