Steven K. HAWORTH, Petitioner,

v.

Duane SHILLINGER, Warden Wyoming State Penitentiary, and Joseph B. Meyer, Attorney General for the State of Wyoming, Respondents.

No. 94–CV–0006–B.

United States District Court,
D. Wyoming.

May 26, 1994.

Gerald M. Gallivan, Director—Defender Aid Program, University of WY, College of Law (Jeffrey M. Hindoien—Student Intern, argued), Laramie, for petitioner.

Mary Beth Wolff, Asst., Office of WY Atty. Gen., Cheyenne, WY, for respondents.

*ORDER DENYING RESPONDENTS' MO-TION FOR SUMMARY JUDGMENT, GRANTING PETITIONER'S CROSS-MOTION FOR SUMMARY JUDG-MENT, AND GRANTING PETITION-ER'S PETITION FOR A WRIT OF HABEAS CORPUS*

BRIMMER, District Judge.

This matter comes before the Court on Petitioner's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (1988), and the parties' respective motions for summary judgment on the underlying substantive issue. The Court, having considered the materials on file in support of and in opposition to, having heard oral argument, and being fully advised in the premises, hereby FINDS and ORDERS as follows:

### Background

Petitioner Steven K. Haworth was convicted by a jury of aggravated assault and battery for his use of a pocketknife during a fight with an individual named Rod Risk on May 23, 1990 outside a bar near Casper, Wyoming. Haworth asserted that he acted in self-defense, but the jury rejected this argument.

Petitioner appealed his conviction to the Wyoming Supreme Court, raising one issue on appeal, which was framed as follows:

[w]hether the prosecution's deliberate and covert intrusion into [petitioner's] trial preparations, alerting the prosecution of [petitioner's] defense strategy, violated [petitioner's] fifth and sixth amendment rights to a fair trial and effective assistance of counsel, respectively.

*Haworth v. State*, 840 P.2d 912, 913 (Wyo. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2395, 124 L.Ed.2d 296 (1993). Petitioner's argument on appeal was grounded in the following set of facts.

Because petitioner was unable to post bail, his trial counsel made arrangements with the sheriff's office to meet with petitioner to prepare for trial for several hours of each weekend day for several weeks preceding the date of trial. These sessions were to be held in the courtroom where the trial was to take place. The sheriff's office conditioned this arrangement on the requirement that a deputy sheriff remain with petitioner at all relevant times since petitioner was being held on bond pending trial. Defense counsel made arrangements to pay the deputy's overtime wage. Counsel also stated that he expressly told the deputy that he was working for defense counsel and that "none of this goes out of the room." *Id.* at 913 (footnote omitted).

During the first day of trial, it became apparent to defense counsel that the prosecutor had learned not only about the weekend preparatory sessions between defense counsel and petitioner, but also about the substance of the conversations that occurred at those meetings.[1] As a result, defense counsel requested a meeting in-chambers with the trial judge and the prosecutor prior to the start of trial the next morning. The Wyoming Supreme Court described the result of the in-chambers meeting as follows:

[d]uring this discussion, the trial judge learned about defense counsel's weekend trial preparation sessions with Haworth and the prosecutor's discovery of them. *It was clear that the prosecutor had learned about the sessions, including the substance of some of the conversations between defense counsel and Haworth, from the deputy sheriff who had provided custodial security of Haworth during those sessions.*

*Haworth*, 840 P.2d at 913 (emphasis added). The trial judge advised the prosecution that it could no longer make any reference to the defense's "rehearsals in this courtroom."

This issue did not resurface until the third day of trial. After the prosecution had rested and after the defense had called all of its witnesses except for the defendant, defense counsel requested another in-chambers meeting. At this meeting, defense counsel advised the court of his concern that the prosecution had learned of the substance of some of counsel's conversations with his client, re-

---

1. During direct examination of the victim, the prosecutor asked him whether he, the victim, had rehearsed his testimony in the courtroom prior to the time that he actually testified. The witness answered "no." *See Haworth*, 840 P.2d at 913.

ferring to one specific conversation where counsel, in preparing his client to take the stand, advised him that he should describe his use of the knife during the fight with the word "cut" rather than "stab." *Id.* at 914. The prosecutor was concerned that this testimony had been improperly coached and he wanted to elicit this fact on cross-examination.

During this discussion in chambers, the prosecutor vigorously disputed defense counsel's representation to the court that counsel had expressly instructed the deputy sheriff that confidentiality attached to anything that he overheard during those sessions.[2] The prosecutor, however, did not call the deputy sheriff to testify as to what he was told by defense counsel, thereby leaving defense counsel's representation uncontroverted.

The trial court concluded that the conversation between defense counsel and his client involved work product and that it would be improper for the prosecution to probe this matter on cross-examination. *Id.* The prosecutor then asked for a ruling whether he could ask the defendant the following question: "You have been specifically instructed to use the word 'cut' versus 'stabbed'?" The trial court advised the prosecutor that that question was objectionable. No further discussions took place in chambers, and the trial thereafter resumed, at which time the defendant took the stand.

Throughout the course of his direct testimony, the defendant used the word "cut" rather than "stabbed." On cross-examination, the prosecution asked, without objection from defense counsel, "You have specifically used the word 'cut' versus 'stabbed' in your testimony today, correct?" to which the defendant replied "True." During closing argument, the prosecution again made reference to the fact that the defendant had constantly used the word "cut" rather than "stabbed." After deliberations, the jury returned a verdict of guilty. *Id.* at 916.

The Wyoming Supreme Court, over the lone dissent of Justice Urbigkit, rejected petitioner's sole claim on direct appeal that his Fifth and Sixth Amendment rights were violated by the actions of the prosecutor and the law enforcement officials and affirmed his conviction. *Id.* at 918.

■ Petitioner subsequently filed the present petition in this Court seeking a writ of habeas corpus. The only issue raised in his federal petition is whether the actions of the prosecution in interfering with petitioner's attorney-client relationship violated his Sixth Amendment right to effective assistance of counsel.[3] In support of his argument, petitioner relies on the Supreme Court's decision in *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) and its progeny at the federal appellate level.

---

**2.** This argument is an implicit acknowledgement by the prosecutor that he did in fact learn what the deputy sheriff knew as to the meetings between the defendant and his attorney.

If the prosecutor had not learned this information from the deputy sheriff, then he would have no reason to dispute defense counsel's assertion that he instructed the deputy sheriff that whatever he heard was confidential and was not to leave the room. He would, in other words, have argued that he had no occasion to learn what the deputy sheriff knew.

**3.** It should be pointed out that a *Weatherford* claim that a criminal defendant's attorney-client privilege was invaded is *not* a traditional ineffective assistance of counsel claim governed by the two-pronged test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland,* a petitioner seeks to challenge the adequacy of his counsel's representation.

In contrast, a *Weatherford*-type claim is one where the petitioner alleges that there was some type of interference in the attorney-client relationship that has constitutional implications under the Sixth Amendment. As the Ninth Circuit noted:

> [s]tanding alone, the attorney-client privilege is merely a rule of evidence; it has not yet been held a constitutional right. *See Maness v. Meyers,* 419 U.S. 449, 466 n. 15[, 95 S.Ct. 584, 595 n. 15, 42 L.Ed.2d 574] (1975); *Beckler v. Superior Court,* 568 F.2d 661, 662 (9th Cir.1978). In some situations, however, government interference with the confidential relationship between a defendant and his counsel may implicate Sixth Amendment rights. *See, e.g., Weatherford v. Bursey,* 429 U.S. 545[, 97 S.Ct. 837, 51 L.Ed.2d 30] (1977).

*Clutchette v. Rushen,* 770 F.2d 1469, 1471 (9th Cir.1985). As discussed in this order, this type of claim is governed by a body of law that is distinct from *Strickland.*

The parties agree that this issue is one which the Tenth Circuit has never addressed. The case is, in other words, one of first impression in this circuit. After a careful review of the *Weatherford* decision and the decisions of the courts of appeals that have considered this issue, as well as the important social and public policies implicated by the facts of this case, this Court finds that petitioner's Sixth Amendment rights were in fact violated in this case. Because "the writ [of habeas corpus is a bulwark against convictions that violate 'fundamental fairness[,]' " *Engle v. Isaac,* 456 U.S. 107, 126, 102 S.Ct. 1558, 1571, 71 L.Ed.2d 783 (1982) (quoting *Wainwright v. Sykes,* 433 U.S. 72, 97, 97 S.Ct. 2497, 2511–12, 53 L.Ed.2d 594 (1977) (Stevens, J., concurring)), and because this Court cannot find that petitioner's trial was fundamentally fair, the petitioner's cross-motion for summary judgment is granted and accordingly, so is his petition for a writ of habeas corpus.

### Discussion

At the outset, the Court notes that the petition is procedurally sound in that the claim sought to be raised in this Court is a federal claim that has been exhausted before the courts of the State of Wyoming. There are, therefore, no procedural impediments to this Court reaching and deciding the merits of petitioner's claim.

In order to understand fully the nature of the claim asserted, it will be necessary to start by reviewing the *Weatherford* decision.

A. Weatherford v. Bursey

*Weatherford* involved the following factual scenario. Brett Allen Bursey brought a 42 U.S.C. § 1983 (1988) lawsuit naming, *inter alia,* Jack Weatherford, an informant-agent of the South Carolina State Law Enforcement Division, as a defendant. Bursey and Weatherford were arrested for malicious destruction of property. Although Weatherford participated in this act, he was merely posing as a wrongdoer and was actually working undercover. Bursey was subsequently indicted for this crime. In order to maintain his cover, Weatherford was ostensibly indicted for this crime as well. Both men were released on bond at which time Weatherford continued his masquerade. After he was indicted, the State made arrangements to have counsel appointed to represent Weatherford. As the Fourth Circuit stated:

> [t]he purpose of it all was to convince Bursey and others that Weatherford was in bad trouble so that he could maintain his appearance as an apparent codefendant while actually working [as an undercover informant.]

*Bursey v. Weatherford,* 528 F.2d 483, 485 (4th Cir.1975), *rev'd,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977).

During this period after indictment but prior to trial, Bursey met with his own attorney, C. Rauch Wise, to discuss his defense at trial. During at least two of these meetings, Weatherford was also present during which time he became privy to privileged information that was discussed between Bursey and Wise. Weatherford later argued that his presence at these meetings was not deliberate but rather was done simply to protect his cover.

After it became apparent that Weatherford could no longer maintain his cover as a government agent, the prosecution had Weatherford testify at trial against the defendant. A surprised Bursey was subsequently convicted on the basis of Weatherford's eyewitness testimony.

Bursey then filed his § 1983 action, claiming that Weatherford had communicated tactical defense strategies that he had learned at the meetings between Bursey and Wise to his supervisors and to the prosecutor, and that this deprived him of his Sixth Amendment right to effective assistance of counsel. The district court found that Weatherford essentially played the role of a "passive ear," and that he had not initiated any of the communications in a deliberate effort to elicit information from Bursey. As a result, the court entered judgment for the defendants.

On appeal, the Fourth Circuit reversed, finding that this deliberate governmental intrusion violated Bursey's Sixth Amendment right to counsel. The court rejected the state's argument that only "gross" interferences with the attorney-client relationship

should constitute a Sixth Amendment violation, stating:

> [w]e agree with the Third Circuit that it is a waste of time to undertake to decide whether an intrusion may be characterized as 'gross,' and that instead we should decide whether it is deliberate or inadvertent. Here it was not inadvertent but was knowingly permitted by the prosecution. That the intrusion was not for the purpose of obtaining information but was to maintain Weatherford's cover is, we think, of no consequence. *We conclude that whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial.*

*Bursey,* 528 F.2d at 486 (emphasis added) (footnote omitted). The court of appeals believed that two decisions of the United States Supreme Court, *Black v. United States,* 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966) and *O'Brien v. United States,* 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967), mandated this *per se* rule which required reversal in this case.

The Supreme Court granted certiorari and reversed the Fourth Circuit's decision. The Court concluded that *Black* and *O'Brien* did not mandate a *per se* rule and that reversal was not required absent a showing of "at least a realistic possibility of injury to Bursey or benefit to the State[.]" *Weatherford,* 429 U.S. at 558, 97 S.Ct. at 845.

The most significant aspect of the Court's decision was in its discussion of what constitutes "injury" to a defendant. Without specifically defining this concept, the Court stated that:

> [h]ad Weatherford testified at Bursey's trial as to the conversation between Bursey and Wise; had any of the State's evidence originated in these conversations; had those overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford, an undercover agent, the details of the Bursey–Wise conversations about trial preparations, Bursey would have a much stronger case.

*Id.* at 554, 97 S.Ct. at 843 (footnote omitted). The very next sentence stated that "[n]one of these elements is present here, however." *Id.* at 555, 97 S.Ct. at 843. Thus, the Court's holding was simply that on the particular facts of the case before it, Bursey had failed to demonstrate how he had been injured, or prejudiced, by Weatherford's actions. The Court, however, did not attempt to delineate the contours of what would constitute the requisite injury to support a Sixth Amendment violation. All that the Supreme Court held in *Weatherford* held was that the Fourth Circuit's *per se* rule—that anytime a defendant can show a deliberate intrusion into the attorney-client relationship, reversal is required—was wrong and that *if* Bursey had been able to demonstrate some additional harm, characterized by the criteria set out above, then he would have had a "much stronger case."

It is at this juncture that the lower court's treatment of this issue becomes important. Unfortunately, for this Court, there is no authoritative precedent from the Tenth Circuit that guides the inquiry into what constitutes prejudice to support a Sixth Amendment violation.

B. *Lower Court Treatment of the "Prejudice" Requirement*

██ The lower federal courts have struggled with the *Weatherford* decision due to its lack of specific guidance on the prejudice requirement. All of the circuit courts that have addressed this issue have agreed, however, that the inquiry is guided by what the petitioner in *Weatherford* had *failed* to show, namely: (1) whether evidence used at trial was produced directly or indirectly by the intrusion; (2) whether the intrusion by the government was intentional; (3) whether the prosecution received otherwise confidential information about trial preparations or defense strategy as a result of the intrusion; and (4) whether the overheard conversations and other information were used in any way to the substantial detriment of the petitioner. *See, e.g., United States v. Kelly,* 790 F.2d 130, 137 (D.C.Cir.1986).

It is clear from *Weatherford* that an intrusion, standing alone, is insufficient as a matter of law to constitute a violation and that an "intrusion plus" standard is appropriate. The question remains as to what constitutes the "plus" portion of this inquiry. While the lower courts agree that the four factors set out in *Weatherford* guide the analysis, the courts diverge as to what combination of these factors is sufficient to constitute a violation, and whether any of these factors is necessary to support a showing of prejudice.

The Third and Eleventh Circuits have apparently held that a Sixth Amendment violation can be established if any one of the four factors is proven. *See United States v. Costanzo*, 740 F.2d 251, 254–55 (3d Cir.1984); *United States v. Roper*, 874 F.2d 782, 790 (11th Cir.1989). The Fourth and Ninth Circuits have stated that it is appropriate to evaluate each of these four factors individually, and in so doing, have implicitly recognized that each factor alone may be sufficient to support a violation. *See Clutchette*, 770 F.2d at 1471–72; *United States v. Brugman*, 655 F.2d 540, 546 (4th Cir.1981). The Sixth and Eighth Circuits have taken a somewhat stricter approach, holding that proof of an intentional intrusion alone is insufficient unless the confidential information learned is actually communicated to the prosecution or unless the petitioner is prejudiced in some other way. *See United States v. Singer*, 785 F.2d 228, 234 (8th Cir.1986); *United States v. Steele*, 727 F.2d 580, 586 (6th Cir.1984). The Second Circuit has held that if the intrusion was unintentional or intentional but justifiable, then the burden shifts to the petitioner to demonstrate that there was communication of confidential information and that there was prejudice. *See United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir.1985). Finally, the First Circuit has held that the petitioner must show that confidential communications were conveyed to the prosecution as a result of the informant's presence. If this is shown, then the burden shifts to the government to prove that there has been and there will be no prejudice to the petitioner. *See United States v. Mastroianni*, 749 F.2d 900, 907 (1st Cir.1984); *Cinelli v. City of Revere*, 820 F.2d 474, 478 (1st Cir.1987). The District of Columbia Circuit,[4] along with the Fifth, Seventh and Tenth Circuits, have not specifically addressed this issue as of the date of this order.

Thus, it is readily apparent that the persuasive authority that this Court may look to for guidance on this issue is anything but uniform. Before the discussion as to what this Court believes to be the most appropriate definition of the "intrusion plus" standard, however, it is helpful to review the Wyoming Supreme Court's analysis of this issue on petitioner's direct appeal.

### C. The Wyoming Supreme Court's Decision

The Wyoming Supreme Court made specific findings relative to the *Weatherford* analysis, but ultimately rejected petitioner's legal argument that those facts compelled the conclusion that petitioner's Sixth Amendment rights had been violated.

In this regard, the Wyoming Supreme Court specifically found that the deputy's presence at the preparatory sessions was not purposely caused by the prosecution in order to obtain privileged information. *See Haworth*, 840 P.2d at 917. The court also found that "the only information" and "the only details" which the prosecution obtained related to the cut versus stabbed word choice. *Id.* The court concluded that this information was *de minimis* in light of the other evidence produced at trial. *Id.*

As a result, the court concluded that petitioner had not demonstrated how he had been "substantially prejudiced" by this intrusion. *Id.*

---

**4.** The District of Columbia Circuit stated in *Kelly* that it had yet to "enter the fray." *Kelly*, 790 F.2d at 137. That court, however, did opine on this issue in an earlier opinion that was subsequently vacated on different grounds. *See Briggs v. Goodwin*, 698 F.2d 486 (D.C.Cir.), *vacated on other grounds*, 712 F.2d 1444 (D.C.Cir.1983).

The earlier *Briggs* opinion took a relatively relaxed view, holding that the mere possession of confidential information by the prosecution was sufficient ipso facto to establish detriment to the petitioner so as to support a *Weatherford* violation. *See Briggs*, 698 F.2d at 494–95.

### D. *The Case at Bar*

■ In reviewing a petition for a writ of habeas corpus, a federal district court must, by statute, indulge a "presumption of correctness" with respect to a state court's findings of fact. *See* 28 U.S.C. § 2254(d) (1988); *see also Rushen v. Spain,* 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983) (*per curiam*) (citing *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981)); *see also Dunn v. Roberts,* 963 F.2d 308, 312 & n. 2 (10th Cir.1992). *See generally Keeney v. Tamayo–Reyes,* 504 U.S. ——, —— ——, 112 S.Ct. 1715, 1722–27, 118 L.Ed.2d 318 (1992) (O'Connor, J., dissenting). Irregardless of these holdings, this Court would as a matter of course indulge that presumption anyway, because of its great respect for the wisdom and ability that the Supreme Court of Wyoming possesses and enjoys. This presumption of correctness limits the scope of review available in a habeas corpus case, as it requires a federal habeas court to afford a "high measure of deference" to a state court's factual findings, *see Rushen,* 464 U.S. at 120, 104 S.Ct. at 456 (citation omitted), absent "'convincing evidence' to the contrary[.]" *Rushen,* 464 U.S. at 120, 104 S.Ct. at 456 (citing *Marshall v. Lonberger,* 459 U.S. 422, 431–32, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983)). As long as the record before the federal court provides at least "fair support" for the state court's findings, then those findings may not be set aside. *See Marshall,* 459 U.S. at 432, 103 S.Ct. at 849–50.

In essence, this Court's review involves a *de novo* application of the applicable legal principles to the facts as they were found by the state courts.

■ It cannot be disputed that the essence of the Sixth Amendment right to effective assistance of counsel is privacy of communication between counsel and client. *See Glasser v. United States,* 315 U.S. 60, 62, 62 S.Ct. 457, 461, 86 L.Ed. 680 (1942); *cf. Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The *Weatherford* Court interpreted its earlier decisions in *Black* and *O'Brien* as standing for the proposition that "when conversations with counsel have been overheard, the constitutionality of the convic-tion depends on whether the overheard conversations have produced, directly or indirectly, *any* of the evidence offered at trial." *Id.* 429 U.S. at 552, 97 S.Ct. at 842 (emphasis added).

The nature of the prejudice inquiry is tied to the competing public policies that are implicated. The prejudice inquiry and the prophylactic nature of the resulting rule of law are inversely related; that is, as the prejudice inquiry becomes more relaxed, the resulting rule of law becomes more of a means to deter such conduct *ab initio.* Conversely, as the prejudice inquiry heightens, the rule of law becomes less prophylactic and less likely to prevent such conduct at the outset. The more relaxed that the prejudice inquiry is, the more credence is given to the strong public policy in favor of "assur[ing] fairness in the adversary criminal process," *Singer,* 785 F.2d at 234 (citing *Gideon v. Wainwright,* 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963)), and attempting to deter governmental conduct that threatens the integrity and the fairness of the judicial process. On the other hand, as the prejudice inquiry becomes more rigorous, the public policy in favor of "society's competing interest in prosecuting criminal conduct[,]" *Singer,* 785 F.2d at 234, becomes the prevailing policy goal.

In view of these observations, the Court inclines to the view that the more salutary public policy favors the adoption of a less demanding prejudice inquiry. More than just the attorney-client relationship is at stake in these situations, because apart from raising ethical and moral questions, these situations pose a serious threat to the integrity of the judicial process itself and the risk of undermining public confidence in our adversarial, and impartial, system of justice. *See, e.g., Haworth,* 840 P.2d at 918 (Urbigkit, J., dissenting). While legitimate law enforcement efforts often require undercover work, the attempt "to acquire leverage in litigative advantage" in some cases simply crosses the line between legitimate undercover work and a disregard for certain basic, fundamental rights possessed by criminal defendants. *Id.* at 926. That is what happened here—the sheriff and the prosecutor took an unconscio-

nable advantage of the defendant by sharing the results of confidential communications. For reasons given below, and much as it pains me to find myself in disagreement with the justices of the Wyoming Supreme Court, the Court nevertheless is constrained to find that the actions of the prosecution in this case crossed the line and amounted to a constitutional violation which this Court must redress by way of a writ of habeas corpus.

Our first inquiry must focus on the nature of the intrusion and whether it was intentional or accidental. In *Weatherford,* the Supreme Court stated that the intrusion itself is *not* simply the informant's act of hearing the privileged communications. This result makes sense because "[a]s long as the information possessed by [the informant] *remained uncommunicated,* [the informant] posed no substantial threat to [the defendant's] Sixth Amendment rights." *Weatherford,* 429 U.S. at 556, 97 S.Ct. at 844 (emphasis added). This statement also stands as an implicit recognition that the nature of the intrusion depends not only on the reason and motivation for the informant's presence, but also the circumstances surrounding the actual disclosure of those communications. Obviously, the prejudice inquiry will be greatly illuminated by whether the disclosures were intentionally divulged by the informant to the prosecution—either because "the informant was *instructed* to intrude on the lawyer-client relationship or [because] the informant has assumed *for himself* that task and acted accordingly[,]" *Weatherford,* 429 U.S. at 557, 97 S.Ct. at 844 (emphasis added)—or whether the communications were accidentally revealed. *Weatherford* thus dictates that the intrusion itself occurs when there is disclosure of the confidential information.[5]

As far as whether the intrusion was intentional *vel non,* it appears that although an intentional disclosure of a confidential communication might very well be unethical conduct that warrants disciplinary action, that fact, standing alone, does not necessarily make the challenged conduct *unconstitution-*

*al.* For present purposes, this Court may concern itself only with the constitutionality of this practice for two primary reasons. First, the Supreme Court in *Weatherford* expressly stated that a federal court may "disapprove an investigatory practice only if it violates the Constitution." *Weatherford,* 429 U.S. at 557, 97 S.Ct. at 845. Second, and perhaps more importantly, a writ of habeas corpus may only be granted upon a showing that a state prisoner is "in custody in violation of the *Constitution* or laws or treaties of the United States." 28 U.S.C. § 2254(a) (1988). Thus, the immoral or unethical nature of the conduct is essentially irrelevant if the conduct at issue does not offend the Constitution or other federal law.

The Court believes something more than an intentional intrusion is necessary to support a *Weatherford* claim. Petitioner must demonstrate that the application of some combination of the remaining factors demonstrates prejudice. *See Kelly,* 790 F.2d at 136, 137. Those remaining factors look to whether the prosecution benefitted from this information *by using it* in some form at trial, and if so, whether this use at trial was detrimental to the defendant in any way.

■ Thus, the question now becomes one of applying the Wyoming Supreme Court's findings to these legal concepts. With all due respect to that esteemed tribunal, this Court is obliged to disagree respectfully with its conclusion of law that the petitioner did not demonstrate prejudice from this intrusion.

The facts here present the "much stronger case" that the Supreme Court found to be absent in *Weatherford.* In this case, the only possible explanation for how the prosecution came to learn that defense counsel coached his client to use the word "cut" rather than "stabbed" is that the deputy sheriff either voluntarily revealed this information or that the prosecution milked the information from him. Either way, it is clear that there was disclosure of this information. Moreover, as

---

5. At least one court found that disclosure itself is the critical issue and that if disclosure is made, it is, in essence, presumptively prejudicial. The court stated "[w]e think that the inquiry into prejudice must stop at the point where attorney-

client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case." *United States v. Levy,* 577 F.2d 200, 209 (3d Cir.1978).

Justice Urbigkit noted in his dissenting opinion, "defense counsel represented, and it is uncontroverted by any *countervailing sworn evidence*, that he understood confidentiality would be maintained by the deputies regarding attorney/client discussions and trial preparations in the courtroom atmosphere." *Haworth*, 840 P.2d at 919 (Urbigkit, J., dissenting) (emphasis in original). Furthermore, while the Wyoming Supreme Court found that the deputy sheriff was not placed in the courtroom during the preparatory sessions with the intent of acting as an informant, *id.* at 917, (a conclusion which this Court accepts but finds mighty suspicious), the fact remains that this evidence was nonetheless disclosed at a later time. This is the intrusive conduct that can, under certain circumstances, impermissibly offend the Sixth Amendment.

Although no specific finding was made as to whether this disclosure was intentional, the record clearly supports an inference that it was not accidental. It is hard to believe that if this information had been the result of an accidental disclosure, the prosecutor would have nonetheless used this information at trial. In addition, as noted above, when this information was brought to light at the second in-chambers conference, the prosecutor did not represent that he had accidentally come upon this information. Instead, he chose to take issue with defense counsel's assertion that he had instructed the deputy sheriff that confidentiality attached to anything that he heard. In other words, the prosecutor implicitly conceded that he had sought out this information, but then tried to make the *post hoc* argument that he did not think that this information was confidential and therefore, he did not believe that its use was problematic. As a result, there is evidence that supports an inference that this evidence was not obtained by accident.

Finally, the Wyoming Supreme Court made express findings that the prosecution used the information that it learned at trial. This finding is supported by the evidence as to the in-chambers conferences, the cross-examination of the defendant and the prosecution's closing argument. As the Supreme Court stated in *Weatherford* on at least two occasions, the proper inquiry is whether "*any* of the State's evidence originated in [the overheard] conversations." *Weatherford*, 429 U.S. at 554, 97 S.Ct. at 843; *see also id.* at 552, 97 S.Ct. at 842. By its own terms, it does not require any type of quantitative assessment as to how much information was used, perhaps out of recognition that the use of "any" evidence is simply too great of a risk to the integrity of the judicial process and that such conduct may very well have an undesirable chilling effect on the attorney-client relationship which could inhibit the policy of full disclosure that that privilege seeks to foster. As noted, the Wyoming Supreme Court did find that this evidence was used at trial. *See Haworth*, 840 P.2d at 913. Its follow-up statement, however, that the quantum of evidence used was "de minimis" is simply not relevant under *Weatherford*.[6]

In sum, therefore, it is clear to this Court that the intentional "intrusion plus" standard is the appropriate standard for analyzing a *Weatherford* claim. This standard strikes a proper balance between the need to protect attorney-client confidences and the need for effective undercover law enforcement tactics. Nonetheless, even under the strictest interpretation of this standard, the Court finds that petitioner has carried his burden with respect to the "plus" component.

While it is readily apparent that this area of law needs further examination by "Higher Authorities," it seems clear to this Court that under the present state of the law, petition-

---

**6.** Perhaps the de minimis nature of the evidence might be relevant to whether this violation was harmless error. *See, e.g., Brecht v. Abrahamson*, 507 U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Arizona v. Fulminante*, 499 U.S. 279, 280–81, 111 S.Ct. 1246, 1248–50, 113 L.Ed.2d 302 (1991); *see also Stice v. Shillinger*, 838 F.Supp. 1548, 1551–53 (D.Wyo.1993) (Brimmer, J.).

Nonetheless, the burden of establishing the harmlessness of an error of constitutional magnitude rests with the respondents. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (indicating that the beneficiary of an error bears the burden of proving its harmlessness). Because the respondents have failed to advance this argument, it follows *a fortiori* that it has failed to carry its burden of proving harmlessness.

er's Sixth Amendment rights have been violated. His request for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d) is therefore granted. Petitioner is entitled to a new trial before the Wyoming state courts, and every effort should be made to conduct this trial speedily, but if, however, the respondents elect to appeal this ruling to the United States Court of Appeals for the Tenth Circuit, then the filing of a timely notice of appeal should toll the re-trial period pending resolution of this issue by the appellate court.

**THEREFORE,** it is

**ORDERED** that petitioner Haworth's Petition for a Writ of Habeas Corpus be, and the same hereby is, **GRANTED.** It is further

**ORDERED** that the State of Wyoming shall re-try the petitioner if it so chooses within a reasonable time after the receipt of this order. It is further

**ORDERED** that any re-trial in this matter shall be stayed pending appeal should the respondents choose to appeal this ruling.