**Duane SHILLINGER, Warden, Wyoming State Penitentiary, and the Attorney General of The State of Wyoming, Appellant/Respondents,**

v.

**Steven K. HAWORTH,**
**Appellee/Petitioner.**

No. 94–8062.

United States Court of Appeals, Tenth Circuit.

Nov. 17, 1995.

Rehearing Denied Jan. 31, 1996.

Mary Beth Wolff, Senior Assistant Attorney General, Cheyenne, Wyoming, for Appellant/Respondents.

Gerald Gallivan, Defender Aid Program, University of Wyoming College of Law, Laramie, Wyoming, for Appellee/Petitioner.

Before HENRY and McKAY, Circuit Judges, and VRATIL,* District Judge.

HENRY, Circuit Judge.

In this case we must determine the appropriate Sixth Amendment standards governing an intrusion by the prosecution into the defendant's communications with his attorney. The district court held that the defendant's Sixth Amendment rights were violated by the prosecutor's intrusion into the defendant's trial preparation sessions and accordingly granted his petition for habeas relief. We agree that under the facts found by the Wyoming courts the defendant's Sixth Amendment rights were violated, but we remand the case for an evidentiary hearing to determine the appropriate remedy.

## I. BACKGROUND

In 1990, Steven Haworth was arrested after using his pocketknife against Rod Risk in an early-morning brawl outside the Lazy 8 Bar. The fight apparently culminated from a day of drinking, an arm-wrestling match, and an argument involving a Milk Bone dog biscuit. Haworth was charged with aggravated assault and battery and was incarcerated in a local county jail. Because Haworth was unable to make bail, he remained in jail before

his trial. When the trial date approached, Haworth's attorney arranged to hold several preparatory sessions with Haworth in the trial courtroom. Because Haworth was in custody, these pretrial preparatory sessions were held on the condition that a deputy sheriff would be present at all times. Haworth's attorney paid the deputy overtime wages for his services; he also allegedly instructed the deputy to consider himself an employee of defense counsel during the trial preparation sessions and that "none of this goes out of this room," although the prosecutor denied that there was such an understanding. *See Haworth v. State*, 840 P.2d 912, 913 & n. 2 (Wyo.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 2395, 124 L.Ed.2d 296 (1993). Regardless of the nature of the parties' understanding, it is clear "the sheriff required that one of his deputies remain with Haworth during these trial preparation sessions." *Id.* at 913.

On the first day of trial, Rod Risk testified for the prosecution. The prosecutor asked Risk if he had rehearsed his testimony prior to trial, and Risk responded that he had not. Because this aroused defense counsel's concern that the prosecutor intended to cross-examine Haworth about the preparatory sessions, the court held an in-chambers conference on the record. Haworth's attorney moved to suppress evidence of the preparatory sessions, arguing that such evidence would be irrelevant and prejudicial. During the course of this discussion, "it became apparent to Haworth's defense counsel that the prosecutor had learned not only about Haworth's weekend trial preparation sessions with defense counsel but also about the substance of some of the conversations between Haworth and defense counsel during those sessions." *Id.* Specifically, the following exchange took place between the prosecutor, Mr. Crank, and Haworth's attorney, Mr. Sedar:

> MR. CRANK: Your Honor, it is my understanding that the Defendant was brought over here for two hours Friday evening, two hours Saturday afternoon, and two hours on Sunday. His testimony

* Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation.

was video taped. The video tape was reviewed between Mr. Sedar, Mr. Boynton, and the Defendant.

MR. SEDAR: Not the Defendant. The Defendant never saw the video tape.

MR. CRANK: Jeff Laub, Randy Hanson, and a legal intern were in this Courtroom. It is my understanding that the Defendant's language, certain language and certain phrases were suggested to the Defendant. "Let's not use the word stab, let's say that you cut him." It is my understanding that there were instructions on "Don't rock in the seat, sit up, cross your hands in front of you." It guess [sic] well beyond preparing him for a courtroom setting. That is coaching the witness and that is unethical.

. . . .

[MR. SEDAR:] I would ask [Mr. Crank] how he knows all this. I'll tell you how he knows it, because I had to bring an officer over with my client and that officer obviously spoke to Mr. Crank and told Mr. Crank what was going on. I have a real problem with that.

MR. CRANK: Why do you have a problem with that?

MR. SEDAR: Because I was paying him to bring him over. It came out of my pocket to bring him over and then he goes over to you and tells you what is going on down there.

Applts.App. at 17, 19. The prosecutor admitted at this conference that his knowledge of the preparatory sessions was acquired through a conversation with the deputy that was initiated by the prosecutor. The trial judge ruled that although the prosecutor could not directly refer to the preparatory sessions, he could cross-examine Haworth regarding whether his testimony had been coached.

On the following day, the issue was again raised with the trial judge, and a second in-chambers conference was held on the record. Haworth's attorney again expressed his concern that the attorney-client privilege had been compromised by the prosecutor's

knowledge of what went on in the preparatory sessions, and he sought to suppress evidence of the sessions as work product. The prosecutor still wanted to elicit evidence of improper coaching during his cross-examination of Haworth and argued that the attorney-client privilege had been waived by the deputy's presence. The prosecutor was particularly concerned that Haworth had been instructed to use the word "cut" rather than the word "stab" during his testimony. The conference concluded with the following exchange:

THE COURT: I think there are ways that the State is protected in their [sic] cross examination to get at what you are getting at.

. . . .

[The deputy's communication to the prosecutor] just strikes me as being unfair. Not only that, but *it strikes me as being a potential reversible error.*

I think you can get at it in cross examination without referring to the conversations between counsel and the Defendant. That would be my ruling.

MR. CRANK: My question will be, . . . You have been specifically instructed to use the word "cut" versus "stabbed?"

MR. SEDAR: That comes straight out of my work product.

THE COURT: That, I find, is objectionable.

Applts.App. at 32–33 (emphasis added).

When the trial resumed, Haworth testified on his own behalf and used the word "cut" several times to describe the events leading up to his arrest. On cross-examination of Haworth the prosecutor asked: "You have specifically used the word 'cut' versus 'stabbed' in your testimony today, correct?" Applts. Ex. I, vol. 3, at 535. Haworth responded: "True." *Id.* The prosecutor frequently used the word "stab" during the cross-examination and during closing arguments when referring to Haworth's acts on the night in question.[1] Because Haworth

---

1. *See, e.g.,* Applts.Ex. I, vol. 3, at 549–50 ("Stabbed him in the throat, didn't you, Mr. Haworth?"); *Id.* at 550 ("All right. How many

times do you distinctly remember stabbing Mr. Risk?"); *Id.* at 551 ("Then you don't remember any more stab wounds, correct?"); *Id.* at 563

and Risk testified to different versions of the events leading up to Haworth's arrest, the prosecutor's closing argument was mostly devoted to bolstering Risk's credibility and impeaching Haworth. The prosecutor told the jury: "[T]his whole trial process is designed to ferret out inconsistencies and test the soundness of a witness's testimony." *Id.* at 567. Then, when discussing Haworth's testimony, the prosecutor said:

> He is the only witness that you heard from who had to practice his presentation to you. He told you, his testimony was that Mr. Sedar wanted me to practice opening the knife before I actually testified.
>
> You know, he told you that he deliberately in his testimony used the word "cut" versus "stabbed."

*Id.* at 583–84.

The jury rejected Haworth's self-defense theory and found him guilty of aggravated assault and battery under Wyo.Stat. § 6–2–502(a)(ii), (b). Haworth was sentenced to four to five years of confinement in the state penitentiary. Haworth appealed the case to the Wyoming Supreme Court, which held that his right to effective assistance of counsel was not infringed by the actions of the prosecutor and the law enforcement officers, and over a vigorous dissent, the court affirmed his conviction.

Haworth then filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 in the district court. On cross-motions for summary judgment, the district court held that Haworth's Sixth Amendment rights had been violated, granted Haworth's petition for habeas relief, and stayed any retrial by the state pending resolution of this appeal.

## II. DISCUSSION

■ We review the district court's summary judgment order granting Haworth's habeas petition de novo, applying the same legal standard as did the district court under Fed.R.Civ.P. 56(c). *James v. Sears, Roebuck*

*& Co.,* 21 F.3d 989, 997–98 (10th Cir.1994); *see also* Fed.R.Civ.P. 56(c) (Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."). In our review, we will first discuss the presumption of correctness to which state courts' factual determinations are ordinarily entitled in a habeas proceeding. We will then review the relevant Sixth Amendment standards governing intentional prosecutorial intrusions into a defendant's relationship with his attorney. Finally, we will consider the relevant precedent guiding the district court's effort to fashion an appropriate remedy in this case on remand.

### A. Presumption of Correctness of State Courts' Factual Findings

■ Federal courts entertaining habeas petitions must give a presumption of correctness to the state courts' factual findings absent an exception specifically enumerated in 28 U.S.C. § 2254(d). *Burden v. Zant,* 498 U.S. 433, 437, 111 S.Ct. 862, 865, 112 L.Ed.2d 962 (1991) (per curiam). Under the exception delineated in § 2254(d)(2), this presumption of correctness does not apply if "the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing." 28 U.S.C. § 2254(d)(2). Nor does the presumption apply if the federal habeas court determines that the state court findings are not "fairly supported by the record." *See* 28 U.S.C. § 2254(d)(8); *Demosthenes v. Baal,* 495 U.S. 731, 735, 110 S.Ct. 2223, 2225, 109 L.Ed.2d 762 (1989) (per curiam).

■ In this case, the Wyoming Supreme Court made two factual findings that Haworth takes issue with and that are pertinent to our analysis. First, the court stated that "the only information which the prosecution obtained and used in any manner was that Haworth would consciously employ the word 'cut' instead of the word 'stabbed' to describe his use of the pocketknife during the fight." *Haworth,* 840 P.2d at 917. The court went

---

("He stabbed him.... He took that small knife ... and he stabbed that kid.... He stabbed that kid that just wanted to go home that night."); *Id.* at 569 ("We know that is where ... he was

stabbed in the lungs."); *Id.* at 594 ("[T]he Defendant stabbed another human being, stabbed him at least four times....").

on to state that "the only details about trial preparation which the prosecution learned were those relating to the choice of words just mentioned." *Id.*

These findings were based solely upon the Wyoming Supreme Court's review of the transcripts of the two in-chambers conferences. Having reviewed these same transcripts, we not only find no support in the record for the conclusion that the deputy relayed nothing more to the prosecutor about Haworth's trial preparation, but we find statements made by the prosecutor himself that diametrically oppose that finding. When asked by the trial judge how Haworth's trial preparation differed from preparatory strategies commonly used by the prosecutor's office, the prosecutor replied:

> MR. CRANK: Your Honor, it is my understanding that the Defendant was brought over here for two hours Friday evening, two hours Saturday afternoon, and two hours on Sunday. His testimony was video taped. The video tape was reviewed between Mr. Sedar, Mr. Boynton, and the Defendant.
>
> . . . .
>
> ... It is my understanding that the Defendant's language, certain language and certain phrases were suggested to the Defendant. "Let's not use the word stab, let's say that you cut him." It is my understanding that there were instructions on "Don't rock in the seat, sit up, cross your hands in front of you." It guess [sic] well beyond preparing him for a courtroom setting.

Applts.App. at 17. When the trial judge asked the prosecutor whether he "received any information on the interrogation practices," *id.* at 28, the prosecutor explained how he had approached the deputy about the preparatory sessions and was informed as follows:

> MR. CRANK: [The deputy] told me about the cut versus stab. He told me that Mr. Boynton had been over here working on potential cross examinations. He told me that they had rehearsed looking at the jury.

*Id.* at 29. Thus, it is apparent from the prosecutor's own admissions that the sugges-

tion to use the word "cut" rather than the word "stab" was not "the only detail[ ] about trial preparation which the prosecutor learned." *See Haworth,* 840 P.2d at 917. It is also evident from the record that the prosecutor's statements are the only evidence the Wyoming Supreme Court relied upon in determining the extent of the prosecution's intrusion. The Wyoming courts never held a hearing beyond these in-chambers conferences; the deputy was never asked to testify or to otherwise make a statement regarding the matter; and no other factfinding procedure was employed beyond adopting the assertions made by the prosecutor—most of them arguably hearsay—at a conference in which he was not subject to the penalties of perjury.

The Wyoming court's finding that the only information relayed to the prosecution about the preparatory sessions was the instruction to use the word "cut" instead of "stab" is not "fairly supported by the record" in light of the prosecutor's own statements to the contrary. *See* 28 U.S.C. § 2254(d)(8). We also believe that the "factfinding procedure employed by the State court was not adequate to afford a full and fair hearing." *See id.* § 2254(d)(2). In this regard, we again emphasize that no sworn testimony was ever taken, and most of what was relied upon by the Wyoming Supreme Court was hearsay. The procedures afforded by the Wyoming courts completely denied "any opportunity to challenge or impeach" the prosecutor's assertions or those he attributed to the deputy. *See Ford v. Wainwright,* 477 U.S. 399, 415, 106 S.Ct. 2595, 2604, 91 L.Ed.2d 335 (1986) (" '[C]ross-examination ... is beyond any doubt the greatest legal engine ever invented for the discovery of truth.' ") (quoting 5 John Henry Wigmore, *Evidence* § 1367 (James H. Chadbourn rev. 1974)). We therefore cannot afford the presumption of correctness to the Wyoming courts with regard to this finding.

■ The existing record in this case makes clear—from the prosecutor's own admissions—that at the very least, the prosecution received the following information about Haworth's trial preparation through the deputy's communication: Haworth was instruct-

ed to use the word "cut" instead of "stab"; his testimony was videotaped and reviewed; he was instructed on how to sit in his seat; he practiced looking at the jury; and he worked on potential cross-examinations with one of the public defenders. Because of the absence of an adequate factfinding procedure in this case, we do not know whether the deputy relayed any other information to the prosecutor.[2] With regard to the Wyoming Supreme Court's finding that the only information "obtained *and used* " by the prosecution was the decision to use the word "cut" instead of the word "stabbed," *see Haworth,* 840 P.2d at 917 (emphasis added), we note that it is, of course, impossible to know what information obtained by the prosecution from the deputy was used at trial without knowing the extent of the information that was obtained. We therefore do not afford the presumption of correctness to this finding either.

As we will explain more fully below, although the state court factfinding procedures were inadequate in this case, we believe that the evidence in the existing record sufficiently supports the district court's determination that Haworth's Sixth Amendment rights were violated by the prosecutor's intrusion. Nevertheless, we find it necessary to remand the case for an evidentiary hearing, *see Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled on other grounds, Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), in order for the district court to determine whether retrial by the state would adequately vindicate Haworth's Sixth Amendment rights.

### B. Prosecutorial Intrusion into the Attorney–Client Relationship

■ In *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), the Supreme Court recognized that under some circumstances a defendant's Sixth Amendment rights may be violated by the state's intrusion into the attorney-client relationship. In that case, an undercover law enforcement agent, Weatherford, was arrested and indicted along with the defendant, Bursey, in order to maintain Weatherford's cover. Under the belief that Weatherford was Bursey's codefendant, Bursey's attorney asked Weatherford to attend certain trial preparation sessions. Weatherford then testified for the prosecution at trial, but never referred to the preparatory sessions in any way. Bursey was subsequently convicted.

Bursey thereafter sued Weatherford pursuant to 42 U.S.C. § 1983 in Weatherford's capacity as a state law enforcement agent. Bursey alleged that Weatherford had communicated defense strategies and plans to the prosecutors, thereby violating Bursey's right to effective assistance of counsel under the Sixth and Fourteenth Amendments. The district court entered judgment in Weatherford's favor and made the following finding:

> At no time did Weatherford discuss with or pass on to his superiors or to the prosecuting attorney or any of the attorney's staff "any details or information regarding the plaintiff's trial plans, strategy, or anything having to do with the criminal action pending against plaintiff."

*Weatherford,* 429 U.S. at 548, 97 S.Ct. at 840.

On appeal, the Fourth Circuit adopted a rule that would have held that " 'whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial.' " *Id.* at 549, 97 S.Ct. at 840 (quoting *Bursey v. Weatherford,* 528 F.2d 483, 486 (4th Cir.1975)). The Supreme Court reversed the Fourth Circuit, holding that no Sixth Amendment violation had occurred. Although the Court held that the Fourth Circuit's "*per se* right-to-counsel rule" was more restrictive than necessary to vindicate the Sixth Amendment interests at stake, *id.*

---

2. Justice Urbigkit of the Wyoming Supreme Court recognized the problematic nature of the state court's factfinding procedures in this case:

> What do we not know? The deputy prosecutor did not testify under the punitive constraints of disbarment or felony perjury.... The deputy sheriff was not brought before the trial court, put under oath, or otherwise examined to obtain a factual recitation of his involvement.

*Haworth,* 840 P.2d at 921 (Urbigkit, J., dissenting). Justice Urbigkit urged the court to remand the case for an evidentiary hearing. *See id.* at 922.

at 550–51, 557, the Court also explained that under some circumstances a prosecutor's intrusion may violate the Sixth Amendment, although such circumstances were not present in Bursey's case:

> At the same time, we need not agree with petitioners that whenever a defendant converses with his counsel in the presence of a third party thought to be a confederate and ally, the defendant assumes the risk and cannot complain if the third party turns out to be an informer for the government who has reported on the conversations to the prosecution and who testifies about them at the defendant's trial. Had Weatherford testified at Bursey's trial as to the conversation between Bursey and [his attorney]; had any of the State's evidence originated in these conversations; had those overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford, an undercover agent, the details of the ... conversations about trial preparations, Bursey would have a much stronger case.

*Id.* at 554 (footnote omitted). The Court noted the district court's "express finding that Weatherford communicated nothing at all to his superiors or to the prosecution about Bursey's trial plans or about the upcoming trial" and therefore reasoned that there had been "no substantial threat to Bursey's Sixth Amendment rights." *Id.* at 556. The Court also emphasized both the absence of purposefulness in the prosecutor's intrusion and the legitimate law enforcement interests at stake:

> Moreover, this is not a situation where the State's purpose was to learn what it could about the defendant's defense plans and the informant was instructed to intrude on the lawyer-client relationship or where the informant has assumed for himself that task and acted accordingly....
>
> That the *per se* rule adopted by the Court of Appeals would operate prophylactically and effectively is very likely true; but it would require the informant to refuse to participate in attorney-client meetings, even though invited, and thus for all practical purposes to unmask himself.

> Our cases, however, have recognized the unfortunate necessity of undercover work and the value it often is to effective law enforcement. We have also recognized the desirability and legality of continued secrecy even after arrest. We have no general oversight authority with respect to state police investigations. We may disapprove an investigatory practice only if it violates the Constitution; and judged in this light, the Court of Appeals' *per se* rule cuts much too broadly.... [U]nless *Weatherford communicated the substance of the ... conversations and thereby created at least a realistic possibility of injury to Bursey or benefit to the State, there can be no Sixth Amendment violation....*
>
> There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment....

*Id.* at 557–58 (citations omitted) (emphasis added).

In a well-crafted opinion, the district court in the instant case carefully reviewed the *Weatherford* decision and the decisions of other courts of appeals in light of "the important social and public policies implicated by the facts of this case." *Haworth v. Shillinger,* 852 F.Supp. 961, 964 (D.Wyo.1994). The district court noted that under the circumstances in *Weatherford* the mere intrusion into the attorney-client relationship was insufficient to constitute a Sixth Amendment violation and that some risk of prejudice had to be shown. The district court went on to hold that the prejudice standard was met in this case because of the communication of trial strategy to the prosecutor and his use of that information to impeach Haworth during his testimony at trial. Although we agree with the district court that under the facts of this case the prejudice standard articulated in *Weatherford* has been met, we believe this case presents a situation unlike *Weatherford* in that the intrusion here was not only intentional, but also lacked a legitimate law enforcement purpose.

Given the Supreme Court's consideration of the requirements of "effective law enforcement" and the absence of purposeful miscon-

duct under the circumstances in *Weatherford,* commentators and courts have suggested that in cases where the prosecution acts intentionally and without legitimate purpose, such intrusions might not be wholly governed by the *Weatherford* decision. Specifically, *Weatherford* may not dictate a rule that would require a showing of prejudice in cases where intentional prosecutorial intrusions lack a legitimate purpose. *See Briggs v. Goodwin,* 698 F.2d 486, 493 n. 22 (D.C.Cir.) (noting that "[a] deliberate attempt by the government to obtain defense strategy information or to otherwise interfere with the attorney-defendant relationship through the use of an undercover agent may constitute a *per se* violation of the Sixth Amendment"), *reh'g granted, opinion vacated, and on reh'g,* 712 F.2d 1444 (D.C.Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984); *United States v. Morales,* 635 F.2d 177, 179 (2d Cir.1980) ("[B]ecause the ... evidence ... does not disclose an intentional, governmentally instigated intrusion upon confidential discussions between appellants and their attorneys, the evidence does not support appellants' claim of a *per se* violation of their right to counsel."); 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 11.8, at 75 (1984) ("*Weatherford*'s conclusion that a state invasion of the lawyer-client relationship does not violate the Sixth Amendment unless there is at least a realistic likelihood of a governmental advantage arguably was limited to cases in which there was a significant justification for the invasion.").

Indeed, in *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1980), which like *Weatherford* was also written by Justice White, the Court left open the question of whether intentional and unjustified intrusions upon the attorney-client relationship may violate the Sixth Amendment even absent proof of prejudice. In *Morrison,* federal law enforcement agents met with the defendant outside the presence of her attorney to seek her cooperation. The agents also made disparaging remarks to the defendant regarding her attorney's legal ability. The defendant thereafter moved to dismiss her indictment with prejudice. The district court denied the motion, but the Court

of Appeals reversed, holding that the defendant's Sixth Amendment rights had been violated and that dismissal of the indictment was the appropriate remedy. Before the Supreme Court, the government argued that there could be no Sixth Amendment violation absent proof that the intrusion prejudiced the defendant. The Court specifically declined to reach the issue, however, holding only that even if the defendant's Sixth Amendment rights were violated, dismissal of the indictment was an inappropriate remedy in that case. Thus the Court appeared to recognize that *Weatherford*—and the prejudice requirement articulated in that case—does not necessarily govern intentional intrusions by the prosecution that lack a legitimate purpose.

The Third Circuit has adopted the rule that intentional intrusions by the prosecution constitute *per se* violations of the Sixth Amendment. *See United States v. Costanzo,* 740 F.2d 251, 254 (3d Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3477, 87 L.Ed.2d 613 (1985); *United States v. Levy,* 577 F.2d 200, 210 (3d Cir.1978). The Second and District of Columbia Circuits, on the other hand, have recognized that prejudice may not be required when an intrusion is intentional, but have not specifically decided. *See Briggs, supra,* 698 F.2d at 493 n. 22; *Morales, supra,* 635 F.2d at 179. The First, Sixth, and Ninth Circuits have held that something beyond the intentional intrusion itself is required to rise to the level of a Sixth Amendment violation. *See United States v. Mastroianni,* 749 F.2d 900, 907 (1st Cir.1984) (holding that even in the context of an intentional intrusion lacking any justification, "[a] Sixth Amendment violation cannot be established without a showing that there is a 'realistic possibility of injury' to defendants or 'benefit to the State' as a result of the government's intrusion," but placing a "high burden" on the state to rebut the defendant's prima facie showing of prejudice) (quoting *Weatherford,* 429 U.S. at 558, 97 S.Ct. at 845); *United States v. Steele,* 727 F.2d 580, 586 (6th Cir.1984) ("Even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted.") (citing *Mor-*

*rison,* 449 U.S. at 365–66, 101 S.Ct. at 668–69), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984); *United States v. Glover,* 596 F.2d 857, 863–64 (9th Cir.) (holding that even in the context of an intentional intrusion into the attorney-client relationship, that "distinction [does not] overshadow[ ] an important principle to be read from [*Weatherford* ]: that the existence or nonexistence of prejudicial evidence derived from an alleged interference with the attorney-client relationship is relevant in determining if the defendant has been denied the right to counsel"), *cert. denied,* 444 U.S. 857, 100 S.Ct. 117, 62 L.Ed.2d 76, *and cert. denied,* 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979).

Given this split of authority, we must fashion a rule that we believe best accounts for the competing interests at stake. In this regard, we note that—even under the prosecutor's own version of events—the instant case presents a vastly different situation than that confronting the Court in *Weatherford.* This is not a case in which the state's interest in effective law enforcement is at issue. Rather, this is a case in which the prosecutor, by his own admission, proceeded for the purpose of determining the substance of Haworth's conversations with his attorney, and attorney-client communications were actually disclosed. This sort of purposeful intrusion on the attorney-client relationship strikes at the center of the protections afforded by the Sixth Amendment and made applicable to the states through the Fourteenth Amendment.

We necessarily recognize the right to counsel in order to secure the fundamental right to a fair trial guaranteed by the Due Process Clause of the Fourteenth Amendment. *Strickland v. Washington,* 466 U.S. 668, 684–85, 104 S.Ct. 2052, 2062–63, 80 L.Ed.2d 674 (1984); *see also Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976). It follows that the "benchmark" of a Sixth Amendment claim is "the fairness of the adversary proceeding." *See Nix v. Whiteside,* 475 U.S. 157, 175, 106 S.Ct. 988, 998, 89 L.Ed.2d 123 (1986) (citing *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068). The Supreme Court has therefore declared that "[a]bsent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." *United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984). At the same time, however, "[i]n certain Sixth Amendment contexts, prejudice is presumed." *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067. This is particularly true with regard to "various kinds of state interference with counsel's assistance." *Id.; see also Perry v. Leeke,* 488 U.S. 272, 279–80, 109 S.Ct. 594, 599, 102 L.Ed.2d 624 (1989) (stating that the Supreme Court has "expressly noted that direct governmental interference with the right to counsel is a different matter" with regard to whether prejudice must be shown, and collecting representative cases where prejudice need not be proved); *Cronic,* 466 U.S. at 658 & n. 24, 104 S.Ct. at 2046 & n. 24 (citing cases in which the Court has discussed circumstances justifying a presumption of prejudice).

The cases in which state interference with the right to counsel has been held to violate the defendant's Sixth Amendment rights *per se* include the following circumstances: prohibiting direct examination of the defendant by his counsel, *see Ferguson v. Georgia,* 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961); requiring those defendants who choose to testify to do so before any other defense witnesses, *see Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972); refusing to allow defense counsel closing argument in a bench trial, *see Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); and prohibiting any consultation between a defendant and his attorney during an overnight recess separating the direct-examination and the cross-examination of the defendant, *see Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976). *See also United States v. Decoster,* 624 F.2d 196, 201 & nn. 14–17 (D.C.Cir.), *cert. denied,* 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979); 2 LaFave & Israel, *supra,* § 11.8(a). The District of Columbia Circuit has explained the rationale behind the use of a *per se* rule in these cases:

> These state-created procedures impair the accused's enjoyment of the Sixth Amendment guarantee by disabling his counsel from fully assisting and representing him.

*Because these impediments constitute direct state interference with the exercise of a fundamental right, and because they are susceptible to easy correction by prophylactic rules, a categorical approach is appropriate.*

*Decoster,* 624 F.2d at 201 (emphasis added). Also compelling is Justice Urbigkit's poignant dissent in the Wyoming Supreme Court's opinion in this case:

Competent prosecution is faced by perhaps one or, at the most, two acquittals with at least every hundred criminal charges where nine out of ten are resolved by plea and the remaining trials favor conviction. Within these few cases, fairness, honesty and morality are not an undue burden on accomplished justice.

*Haworth,* 840 P.2d at 919 (Urbigkit, J., dissenting) (footnote omitted).[3]

■■■ Because we believe that a prosecutor's intentional intrusion into the attorney-client relationship constitutes a direct interference with the Sixth Amendment rights of a defendant, and because a fair adversary proceeding is a fundamental right secured by the Sixth and Fourteenth Amendments, we believe that absent a countervailing state interest, such an intrusion must constitute a *per se* violation of the Sixth Amendment. In other words, we hold that when the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed. In adopting this rule, we conclude that no other standard can adequately deter this sort of misconduct. We also note that "[p]rejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost." *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067.

Our holding subsumes the state's argument that harmless error analysis should apply to this sort of Sixth Amendment violation because our per se rule recognizes that such intentional and groundless prosecutorial intrusions are never harmless because they "necessarily render a trial fundamentally unfair." *Rose v. Clark,* 478 U.S. 570, 577, 106 S.Ct. 3101, 3105, 92 L.Ed.2d 460 (1986). Additionally, the rule we adopt today in no way affects the analysis to be undertaken in cases in which the state has a legitimate law enforcement purpose for its intrusion. See *Weatherford,* 429 U.S. at 557, 97 S.Ct. at 844 ("our cases ... have recognized the unfortunate necessity of undercover work and the value it often is to effective law enforcement."). Such cases would, of course, require proof of "a realistic possibility of injury to [the defendant] or benefit to the State" in order to constitute a violation of a defendant's Sixth Amendment rights. *Id.* at 558, 97 S.Ct. at 845.

### C. Remedying Sixth Amendment Violations Occasioned by Prosecutorial Misconduct

■■■ Having determined the relevant standard for establishing a Sixth Amendment violation in this context, we must now ascertain the appropriate remedy. In *Morrison, supra,* 449 U.S. 361, 101 S.Ct. 665, the Supreme Court considered whether dismissal of the defendant's indictment with prejudice was an appropriate remedy for the intentional intrusion upon her Sixth Amendment rights by federal law enforcement agents.[4] Recognizing "the necessity for preserving society's interest in the administration of criminal justice," the Court enunciated the following standard: "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *Id.* at 364, 101 S.Ct. at 667. The Court went on to describe how

---

**3.** Justice Urbigkit also expressed his concerns about the collateral effects of a rule that would require proof of prejudice occasioned by an intentional intrusion by the prosecution into the attorney-client relationship: "This is worse than the law of the jungle. It is an invitation to debase morality. Even worse is the present epidemic of hardball lawyering, pervasive if not constituting a terminal disease. Evil, of course, debases the procurer most of all." *Haworth,* 840 P.2d at 923–24 (Urbigkit, J., dissenting).

**4.** The Court assumed that the defendant's rights were violated without specifically deciding. *Morrison,* 449 U.S. at 364, 101 S.Ct. at 667.

similar constitutional violations have generally been remedied:

[W]hen before trial but after the institution of adversary proceedings, the prosecution has improperly obtained incriminating information from the defendant in the absence of his counsel, the remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongfully admitted and the defendant convicted. . . .

Our approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial.

*Id.* at 365, 101 S.Ct. at 668 (citing *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)). The Court held that in light of this precedent, absent some prejudicial effect on the defendant's proceeding "there is no basis for imposing a remedy in that proceeding." *Id.* Because the federal agents received no information from Morrison, and because they otherwise failed to affect her relationship with her attorney, the Court held that there was no basis for imposing a remedy in that case, "much less" dismissal of her indictment. *Id.* 449 U.S. at 366–67, 101 S.Ct. at 668–69.

The district court in the instant case ordered retrial of Haworth at the state's discretion. We believe that a new trial may well be the appropriate remedy in this case because of the use of improperly obtained evidence to impeach Haworth at his trial. *Morrison* makes clear that evidence obtained through an intentional and improper intrusion into a defendant's relationship with his attorney, as well as any "fruits of [the prosecution's] transgression," *see id.* at 366, 101 S.Ct. at 668, must be suppressed in proceedings against him.

At the same time, such an intrusion could so pervasively taint the entire proceeding that a district court might find it necessary to take greater steps to purge the taint. The court may, for instance, require retrial by a new prosecutor. *See, e.g., United States v. Horn*, 811 F.Supp. 739, 752 (D.N.H.1992) (removing the lead prosecutor from the case and ordering her "not to discuss the documents with any prosecutor or witness in this case and not to participate further in any way, directly or indirectly, in the trial preparation or trial of this case"), *rev'd in part*, 29 F.3d 754 (1st Cir.1994). Additionally, dismissal of the indictment could, in extreme circumstances, be appropriate. *Cf. California v. Trombetta*, 467 U.S. 479, 486–87, 104 S.Ct. 2528, 2532–33, 81 L.Ed.2d 413 (1984) (noting that dismissal of the indictment might be appropriate when the government permanently loses potentially exculpatory evidence); *United States v. Bohl*, 25 F.3d 904, 914 (10th Cir.1994) (dismissing the indictment because of the government's destruction of potentially exculpatory evidence).

Given the inadequacy of the state court factfinding procedures in this case, we have serious concerns about the extent of the prosecutor's intrusion. On the record before us, we cannot determine whether the prosecutor obtained and used other information relevant to Haworth's criminal proceedings that may prejudice Haworth upon retrial of the matter. Because we cannot say with absolute certainty that simply retrying this case will sufficiently purge the Sixth Amendment taint occasioned by the prosecutor's intrusion, we feel we must remand the case to the district court for factfinding procedures to determine the extent of the intrusion as well as the proper remedy. *See Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

We AFFIRM the judgment of the district court granting Haworth's petition for habeas relief, but REMAND the case to the district court for reconsideration of the remedy.